Robin UREVICH, and Association of Community Organizations for Reform Now, Plaintiffs-Appellants,

v.

Duane WOODARD, Attorney General for the State of Colorado; and Natalie Meyer, Secretary of State for the State of Colorado, Defendants-Appellees.

No. 82SA235.

Supreme Court of Colorado,
En Banc.

July 18, 1983.

Rehearing Denied Aug. 22, 1983.

Philip Burton Green, Denver, Steven Bachmann, New Orleans, for plaintiffs-appellants.

L. Duane Woodard, Atty. Gen., Charles Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., Richard H. Forman, First Asst. Atty. Gen., Denver, for defendants-appellees.

ROVIRA, Justice.

Appellants Robin Urevich and Association of Community Organizations for Reform Now (ACORN) seek reversal of a decision of the Denver District Court that upheld the validity of section 1–40–110, C.R.S. 1973 (1980 Repl.Vol. 1B), dealing with payment to initiative or referendum petition circulators, and held that a combined fundraising and signature-gathering procedure proposed by ACORN was prohibited by the statute. We reverse.

The trial court decided the case on cross-motions for summary judgment based upon a stipulation of facts. ACORN is a nonprofit Arkansas corporation registered to do business in Colorado. It is an organization of neighborhood groups whose purpose is to advance the interests of persons of low and moderate income. Robin Urevich is the director of staff for ACORN in Colorado.

ACORN wanted to institute a petition campaign to place an initiative on the 1982 ballot or to assist in gathering signatures for a petition proposed by another group. Part of its planned campaign involved sending people into communities to obtain signatures for an initiative petition and at the same time request financial contributions for ACORN. These people were to be paid between thirty and forty percent of the contributions they collected, depending on the number of days worked per week. Their remuneration was not dependent on the number of signatures, if any, obtained.

Prior to beginning its campaign, ACORN sought a judgment declaring its proposed method of petition soliciting not to be in violation of section 1–40–110, C.R.S.1973 (1980 Repl.Vol. 1B). The trial court held that ACORN's method of petition circulation was prohibited by the statute and that the statute was constitutional.

I.

As a threshold matter, we address the defendants-appellees' argument that the issue raised in this appeal is moot because the 1982 elections have been held.

This case falls, as do so many election cases, within the exception to the mootness doctrine that allows review of matters "capable of repetition yet evading review." *See, e.g., American Party v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). In *Moore v. Ogilvie, supra,* the Supreme Court found justiciable a challenge to Illinois' petition requirements for independent candidates for the offices of electors of President and Vice President of the United States, even though the claim was based upon an election that had already been held. The Court stated that "while the 1968 election is over, the burden . . . placed on the nomination of candidates for statewide offices remains and controls future elections, as long as Illinois maintains her present system as she has done since 1935." 394 U.S. at 816, 89 S.Ct. at 1494.

If ACORN were to be denied a decision in this case because of the passage of the date for placing an initiative on the ballot, there is no reason to believe that it will be any more likely to obtain review the next time. The only way ACORN could be assured of obtaining a decision on the merits of its proposed plan would be to proceed with it and raise its arguments in defense to a felony prosecution, a procedure that section 13–51–101 *et seq.,* C.R.S.1973, and C.R.C.P. 57—providing for declaratory judgments— were supposed to make unnecessary. *See Rathke v. MacFarlane,* 648 P.2d 648 (Colo. 1982).

We therefore hold that this action is not moot.

## II.

The people of the State of Colorado "have the sole and exclusive right of governing themselves." *Colo. Const.* art. II, section 2. Moreover, article II, section 1, of the Colorado Constitution provides that "[a]ll political power is vested in and derived from the people." Article V, section 1, describes the power of the people to initiate laws as follows:

"The legislative power of the state shall be vested in the general assembly . . . but the people reserve to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly . . . ."

The right of the people to initiate legislation is a right "of the first order." *McKee v. City of Louisville,* 200 Colo. 525, 616 P.2d 969, 972 (1980). "[I]t is not a grant to the people but a reservation by them for themselves." *Id.*

Although article V, section 1, provides that it "shall be in all respects self-executing," we have held that the general assembly may enact provisions regarding the exercise of the initiative and referendum, "so long as it does not diminish these rights . . . ." *In re Interrogatories Concerning H.B. 1078,* 189 Colo. 1, 8, 536 P.2d 308, 314 (1975). Acts of the legislature that affect the exercise of the initiative "must further the purpose of the right or facilitate its operation." *City of Glendale v. Buchanan,* 195 Colo. 267, 272, 578 P.2d 221, 224 (1978). As we have previously stated, "It is well established in this state that the Legislature may not impose restrictions which limit in any way the right of the people to initiate proposed laws and amendments except as those limitations are provided in the constitution itself." *Colorado Project— Common Cause v. Anderson,* 177 Colo. 402, 404, 495 P.2d 218, 219 (1972).

The initiative provisions of the constitution must be liberally construed to effectuate their purpose of allowing the people to exercise their reserved power to initiate legislation. *Colorado Project—Common Cause v. Anderson,* 178 Colo. 1, 495 P.2d 220 (1972). Any law that limits this "fundamental right at the very core of our republican form of government" is viewed with the closest scrutiny. *McKee v. City of Louisville,* 616 P.2d at 972.

The balance between the legislative power of the general assembly and the legislative power of the people has been struck in favor of the people in the fundamental

charter of our state. No statute passed by the general assembly can be permitted to alter this allocation of power.

### III.

The statute at issue here, section 1–40–110, C.R.S.1973 (1980 Repl.Vol. 1B), provides:

"Any person, corporation, or association of persons who directly or indirectly pays to or receives from or agrees to pay to or receive from any other person, corporation, or association of persons any money or other thing of value in consideration of or as an inducement to the circulation of any initiative or referendum petition or in consideration of or as an inducement to the signing of any such petition commits a class 5 felony . . . ."

ACORN contends that its method of paying its petition-circulators/contribution-solicitors, based upon the amount of money they collect but not on the number of signatures they obtain, if any, does not fall within the ambit of the statute. It argues in the alternative that if its procedure violates the statute, then the statute is an unconstitutional restriction of its right to circulate initiative petitions and solicit contributions.

█ As mentioned previously, statutes that limit the power of the people to initiate legislation are to be closely scrutinized and narrowly construed. That the statute in question acts as a limitation on ACORN's ability to circulate petitions cannot be doubted. We can take judicial notice of the fact that it is often more difficult to get people to work without compensation than it is to get them to work for pay. As the dissent in *State v. Conifer Enterprises, Inc.,* 82 Wash.2d 94, 508 P.2d 149 (1973) (Rosellini, J., dissenting), observed:

"The securing of sufficient signatures to place an initiative measure on the ballot is no small undertaking. Unless the proponents of a measure can find a large number of volunteers, they must hire persons to solicit signatures or abandon the project. I think we can take judicial notice of the fact that the solicitation of signatures on petitions is work. It is time-consuming and it is tiresome—so much so that it seems that few but the young have the strength, the ardor and the stamina to engage in it, unless, of course, there is some remuneration."

█ Not every limitation on initiative-related activity is impermissible. Limitations reasonably necessary to prevent fraud are a legitimate exercise of the general assembly's power to enact laws that facilitate the initiative process. Such limitations must be narrowly crafted, however, to safeguard the right of the people to initiate legislation. Consequently, broad prophylactic rules whose scope far exceeds that necessary to prevent fraud cannot stand in the absence of a narrowing construction.

█ We believe that the language of section 1–40–110 is too broad to survive strict scrutiny. The statute proscribes direct or indirect payment "in consideration of or as an inducement to" circulation of a petition. While we express no view on the propriety of the regulation of "consideration,"[1] we believe that the ban of any "inducement" sweeps far too broadly. The term "inducement" is not defined in the statute, but its dictionary definition is: "a motive or consideration that leads one to action." *Webster's Third New International Dictionary* 1154 (1964). A literal reading would indicate that anyone with a financial incentive, direct or indirect, is prohibited from circulating a petition. Such a broad prohibition cannot withstand close scrutiny, as it unnecessarily trammels the fundamental right of initiative. The attorney general has made no showing that the ban of any financial incentive to the circulation of a petition is reasonably necessary to further the legitimate governmental interest in maintaining the initiative process free from fraud.

---

1. *See Hardie v. Fong Eu,* 18 Cal.3d 371, 556 P.2d 301, 134 Cal.Rptr. 201 (1976), *cert. denied sub nom. California Fair Political Practices Committee v. Hardie,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 360 (1977) (holding that prohibitions against paid petition circulators were in violation of the first amendment).

Once the statute has been narrowed to delete the word "inducement," we must determine whether ACORN's proposed method of petition circulation and contribution solicitation falls within the statutory proscription of payment "in consideration of" the circulation of a petition. We believe that ACORN's method falls outside the statute, because its solicitors are not paid "in consideration of" circulating the petition, but rather "in consideration of" the financial contributions they solicit. The remuneration to ACORN's solicitors is in no way related to the number of signatures, if any, they obtain. There is nothing in the record to suggest that this method of solicitation is in any way a sham to attempt to do indirectly what cannot legally be done directly. As far as we know, ACORN would be willing to allow people to solicit funds without soliciting signatures and would give them the same percentage of contributions obtained that a contribution solicitor who circulated petitions would receive. If solicitors receive the same compensation whether or not they circulate petitions, it can hardly be said that they are being paid "in consideration of" the circulation of the petitions.

The judgment of the district court is reversed.