741 F.2d 1210
 Paul K. GRANT, Edward Hoskins, Nancy P. Bigbee, Lori A.
Massie, Ralph R. Harrison and Coloradans for Free
Enterprise, Inc., Plaintiffs-Appellants,
v.
Natalie MEYER, in her official capacity as Colorado
Secretary of State, and Duane Woodard, in his
official capacity as Colorado Attorney
General, Defendants-Appellees.
 No. 84-1949.
 United States Court of Appeals,
Tenth Circuit.
 July 31, 1984.
 
 Holloway, Circuit Judge, dissented and filed opinion.
 William C. Danks, Denver, Colo., for plaintiffs-appellants.
 Ruthanne Gartland, Asst. Atty. Gen., Denver, Colo. (Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Denver, Colo., with her on brief), for defendants-appellees.
 HOLLOWAY, BARRETT and DOYLE, Circuit Judges.
 PER CURIAM.
 
 
 1
 This appeal by plaintiffs-appellants involves a challenge to the constitutionality, under the First and Fourteenth Amendments, of Section 1-40-110 C.R.S. (1980), which prohibits payment of initiative petition circulators and provides criminal sanctions for violation of the statute. We consolidated consideration of a motion by plaintiffs for an injunction pending appeal with the merits, accelerated the appeal, heard argument on the merits, and have considered the briefs of the parties on the merits and the motion.
 
 
 2
 The court concludes that the judgment of the district court upholding the statute should be, and it is affirmed, and the motion for an injunction is denied. Judge Holloway dissents. The dissenting opinion is attached following the majority opinion.
 
 
 3
 Judges Barrett and Doyle have adopted the opinion of the United States District Court for the District of Colorado filed July 3, 1984 in the captioned cause as the majority opinion of the Court. A copy of the order setting forth the opinion of United States District Judge John P. Moore is attached hereto and is incorporated herein by reference.
 
 APPENDIX
 IN THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF COLORADO
 Civil Action No. 84-JM-1207
 
 4
 PAUL K. GRANT, et al.,
 
 
 5
 Plaintiffs,
 
 
 6
 vs.
 
 NATALIE MEYER, in her official capacity
 
 7
 as Colorado Secretary of State, et al.,
 
 
 8
 Defendant.
 
 ORDER
 
 9
 THIS MATTER is before me on a complaint seeking injunctive and declaratory relief. At issue is whether a statute of the state of Colorado prohibiting payment of persons circulating petitions proposing a constitutional amendment violates the plaintiffs' rights to free speech. Jurisdiction is asserted upon 28 U.S.C. Secs. 1331 and 1343(a)(3).
 
 
 10
 The plaintiffs in this case are interested in the adoption of an amendment to the constitution of the state of Colorado that would remove motor carriers from the jurisdiction of the state Public Utilities Commission. In accordance with provisions of the state law, they have qualified the issue for submission to the registered electors of Colorado; however, before the question can be placed upon the November ballot, the proponents must obtain signatures of 46,737 registered electors upon petitions supporting the measure. They now claim that their ability to achieve this goal would be enhanced if they could employ persons to circulate these petitions, yet they are faced with Colo.Rev.Stat. Sec. 1-40-110, which prohibits and makes criminal the payment of any consideration for the circulation of petitions.
 
 
 11
 Plaintiffs further claim that part of the process of obtaining the signature of electors is the communication to those persons of the merits of the issue. They indicate it is often necessary to educate and argue with potential petition signers to convince them the issue is one which should be considered by the general electorate. Thus, they believe the communication inherent in the petitioning process is political expression, hence protected speech. Upon this predicate, plaintiffs argue that Colo.Rev.Stat. Sec. 1-40-110 inhibits their protected right because it prevents them from hiring persons to help in the dissemination of their beliefs. In support of their argument, they rely principally upon Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Hardie v. Fong Eu, 18 Cal.3d 371, 134 Cal.Rptr. 201, 556 P.2d 301 (1976); and two unpublished United States District Court opinions from the District of Oregon and the District of Columbia. I find these cases either inapposite or unpersuasive.
 
 
 12
 Evidence taken in support of the complaint indicates the plaintiffs' accord that money is a basic motivating factor in obtaining the service of persons to carry public petitions. Each of those plaintiffs who testified indicated that payment for their own time spent in circulating petitions would be welcome, and payment of others to take their places on the hustings would free them for other endeavors. Indeed, one testified that payment of circulators would permit him to spend more lucrative time in pursuit of his profession.
 
 
 13
 At the same time, the evidence did not indicate that plaintiffs were prevented in any way from espousing their cause simply because they could not obtain paid petition circulators. At best, the evidence indicates plaintiffs' purposes would be enhanced if the corps of volunteers could be augmented by a cadre of paid workers.
 
 
 14
 Thus, a threshold question is raised. Does the statute in question constitute a restraint upon the plaintiffs' right to free speech? Remembering that the right asserted here is the right to articulate a political belief to others in face-to-face confrontations over a petition for an initiated constitutional amendment, one must first ask whether the statute imposes a burden on that right.
 
 
 15
 In some of the cases relied upon by plaintiffs, it is apparently assumed that the burden exists. Yet, I question whether the individual right of any of the plaintiffs is affected by this statute. In order to cross the first threshold, one must find that plaintiffs' rights to political elocution have been restricted because they cannot pay someone else to speak. As I understand the contention, it is not that plaintiffs desire to pay for the dissemination of their political position, as one would do in political advertising, but that they desire to pay someone else to speak upon a subject which plaintiffs support. Thus viewed, the question arises as to whose rights of speech are involved. Can plaintiffs claim their rights to free speech have been invaded because someone else cannot be paid to speak? Does the statute in question suppress communication? Is this situation akin to the restriction of campaign contributions upheld by the court in Buckley v. Valeo, supra?
 
 
 16
 In Buckley, the court contrasted the first amendment ramifications of limitations on political contributions to those on political expenditures. The court noted in present society the expenditure of money is a necessary ingredient in effective political speech; therefore, any restriction on expenditures resulting in a suppression of political speech was in conflict with the first amendment. Hence, the effort to restrict the amount one could spend on a political campaign had to result in an unconstitutional restriction on protected communication.
 
 
 17
 In contrast, the court found a limitation on contributions to political campaigns was not constitutionally abhorrent. Because any contribution is nothing more than a generalized expression of support for a candidate or a view, the court concluded a contribution was not the same as a communication of political thought; hence contributions could be restricted.
 
 
 18
 Here we must remember, the advocates of the plaintiffs' proposed constitutional amendment are not restricted in the personal communication of their belief in the proposition in any way but arguably by Colo.Rev.Stat. Sec. 1-40-110. Indeed, their ability to spend money on every other form of thought-dissemination is totally unfettered. While they have testified they would prefer to be able to spend money to hire circulators rather than to buy advertising, the test of constitutionality does not lie in their preferences. One must ask whether their personal rights of speech are transgressed by a restriction which only limits their ability to pay someone else to speak. Within the limited framework of this case, I believe the answer is no.
 
 
 19
 In light of the unlimited possibilities plaintiffs have to publicize their belief in their proposed measure, I am persuaded the statute in question is not a burden on their first amendment right. It seems to me, the limitation imposed by Colo.Rev.Stat. Sec. 1-40-110 restricts only a generalized support for a political thought, much like the contribution of money was regarded in Buckley, supra. Thus, when the statute is placed in this perspective, it does not appear constitutionally onerous.
 
 
 20
 Yet, assuming for the sake of argument that this statute in some way could affect the plaintiffs' personal rights to political speech, have they shown the existence of such an effect? I conclude they have not. The evidence submitted by the plaintiffs consisted principally in their assertion the payment of petition circulators would facilitate the circulation of petitions. As previously indicated, they did not establish any adverse effect upon their ability to communicate arising out of the statute.
 
 
 21
 By contrast, the defendants have proved some provocative historical data from Colorado. This data shows advocates of initiated measures in this state have as much success in getting ballot position for their measures as do citizens in states in which petition circulators can be paid. (See defendants' ex. E.) Statistical data from the District of Columbia and the 23 states whose laws permit the initiative process indicate that since the process was adopted in Colorado in 1910, this state ranks fourth in the total number of initiatives placed upon the ballot. This is so despite the fact that 20 other states and the District of Columbia permit the payment of petition circulators. The evidence also establishes that Colorado's requirements for placing initiated measures upon the ballot are about the least restrictive of any state. These facts tell me the prohibition against payment of circulators is in reality no inhibition.
 
 
 22
 Finally, in light of this data, we must consider whether the state interest to be achieved by the statute is sufficiently compelling to withstand a first amendment attack. The defendants' evidence indicates the initiative process got its start in the west as a "grassroots" means of protecting citizens from overpowering special interest groups whose financial strength was used to manipulate state legislators. Through initiated legislation, citizens were able to enact measures for the benefit of the populace as a whole. Indeed, this form of government has assumed an almost sacrosanct position in the role of individual rights in many states.[1] Therefore, Colorado asserts a compelling interest in protecting the integrity of the process and in insuring any initiated measure has a sufficiently broad base of support to assure its validity for public consideration.[2]
 
 
 23
 While plaintiffs' thrust at the question of state interest is aimed at the potential for illegal acts upon the part of paid circulators, that does not seem to be of significant concern to defendants. Indeed, the state has not suggested paid circulators would be persuaded to violate the law simply because they were paid. Its articulated concern is that people may be persuaded to sign petitions for reasons other than the political validity of the cause espoused.
 
 
 24
 In line with that concern, plaintiff Grant has supplied some substance. He indicated during the course of his testimony how difficult it was to obtain petition signatures. In his experience, he was often unable to get people to listen long enough for him to communicate the benefits of the proposed constitutional amendment. Yet, on one occasion, he found that people were more willing to sign his petition because it was his birthday than they were to sign because they believed in the importance of his cause. He also indicated that in his experience in the state of Florida, a place where circulators can be paid, he encountered circulators of a petition he supported who padded the petitions with names taken from the telephone book. While he stated those petitions were not submitted when the padding was discovered, I would nonetheless assume the circulators were motivated to this endeavor by the money they received for each signature obtained.
 
 
 25
 This testimony leads directly to the state's purpose of protecting the integrity of the process. The evidence has established under Colorado law, all petition signatures have presumed validity, and no effort is made, as in most states, to independently verify the validity of signatures except upon the filing of written objections. Thus, in order to retain the facility with which initiated measures are qualified for the ballot and to protect the validity of petitions, Colorado does have an interest in eliminating a temptation to pad petitions which transcends the remedy of making such padding a criminal offense.
 
 
 26
 As I presently view the situation, the elimination of the temptation to pad is an exchange for the presumption of validity which attaches to petitions. Any change in one would have to have an effect upon the other. Thus, I do not believe the existence of a criminal sanction against subscribing false signatures to a petition is an equivalent and less onerous response to the padding of petitions than the device of eliminating the temptation to do so.
 
 
 27
 While it is of perhaps less significance, it cannot be gainsaid that the testimony of Mr. Grant lends credence to the state's contention paid circulators, who are really sales persons paid on the basis of results, would be persuaded to use techniques of salesmanship which are not inherently illegal just to enhance their own compensation. Indeed, if persons were persuaded to sign Mr. Grant's petition simply because it was his birthday, it takes only a minor stretch of the imagination to conjure possibilities of circulators obtaining signatures because of any other persuasive tactic resulting from the fertile mind of an expert salesman.
 
 
 28
 In short, I take seriously the state's argument it has an interest in protecting the integrity of the initiative process. I look upon the other expressed state interest in like manner.
 
 
 29
 The state's evidence of the history and limitations of the initiative process lends ample credence to its assertion that there is a significant need to insure any measure has a substantial base of support before it is submitted to the electorate. The state's expert pointed out the process of initiative is more rigid in practice than the process of qualifying a candidate for the ballot by petition. That is, an initiated measure is drafted, submitted to state officers for review, comment, and selection of a ballot title, and then presented to the public. Thereafter, the measure cannot be changed in any way. Thus, the electorate is put to the difficult test of whether the measure in its submitted form should be cast into the stone of the constitution or laws of the state. The difficulty arises from the fact that unlike the legislative process existing in the General Assembly, where the process of debate can readily point out mistakes in draftsmanship or concept and where those mistakes can be easily changed, the legislative process of initiative is rigid, and no alterations can be accomplished. Thus, the state has an interest in seeing that any measure has significant support to insure only the better reasoned and drafted measures are given the chance of adoption. See Citizens Against Legalized Gambling v. District of Columbia Board of Elections and Ethics, 501 F.Supp. 786 (D.C.1980).
 
 
 30
 The rigidity of the initiative process makes it a significantly different process from that employed in placing individual candidates on the ballot for consideration by the electorate. For that reason, I wish to be clearly understood that my conclusion in this case is restricted to the process of petition circulation of initiated measures. Whether the same state interests exist, or whether the same first amendment considerations apply to the payment of circulators of petitions for candidates, is a matter I have not considered, yet it is one which must not be confused with the matter before me now.
 
 
 31
 One final consideration should be made. Plaintiffs have relied in part upon Urevich v. Woodard, 667 P.2d 760 (Colo.1983). That case is clearly inapposite, but it does point out another distinction which must be drawn. Even though Urevich pertains to the same statute before me in this case, its result is predicated upon the right of initiative found in the Colorado constitution, and not the first amendment. As previously noted, Colorado regards the right of initiative as the "most important right reserved to [the electors] by the constitution." Colorado Project-Common Cause v. Anderson, 495 P.2d at 221. Thus, whether Colo.Rev.Stat. Sec. 1-40-110 would meet the test of Colo. Const., art. II, Sec. 1, were it to be considered in a state court is a matter upon which I do not speculate.
 
 
 32
 On the basis of the foregoing, which shall constitute my findings and conclusions in this matter, it clearly appears to me plaintiffs have failed to demonstrate their entitlement to relief. Accordingly, it is
 
 
 33
 ORDERED judgment enter in favor of defendants and against plaintiffs. Defendants shall be awarded their costs upon the filing of a proper bill of costs within ten days of the entry of judgment.
 
 
 34
 DATED at Denver, Colorado, this 3rd day of July, 1984.
 
 BY THE COURT:
 
 35
 /s/ John P. Moore
 
 John P. Moore, Judge
 United States District Court
 
 36
 (Signature page of order in Grant v. Meyer, No. 84-JM-1207.)
 
 
 37
 HOLLOWAY, Circuit Judge, dissenting.
 
 
 38
 I respectfully dissent.
 
 
 39
 I am impelled by recent and emphatic decisions of the Supreme Court to disagree with the majority opinion and the conclusions of the district court. To me, the clear meaning of the First Amendment decisions is that the imperatives of the Amendment on freedom of political communication, carried on in the modern day to an important extent by expenditures for publicity or contacts with the public, make any restriction on such communication highly suspect and subject to exacting scrutiny. In addition, the Supreme Court has recognized the special importance of protecting First Amendment rights with respect to ballot measures, like the Colorado initiative measure involved here. When examined with exacting scrutiny as the Court's decisions demand, the Colorado ban on compensation of solicitors for initiative measures fails, since all of the interests which the State suggests in defense of this restriction on communication are or can be protected by less intrusive measures.
 
 
 40
 * On its own motion, this court requested that the parties address the question whether there should be abstention by the federal courts in this case, or a refusal to afford injunctive relief, because of the criminal sanctions in the Colorado statute banning the payment of initiative petition solicitors. In opposing an injunction pending appeal, the State's memorandum cited Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), inter alia, arguing that grounds for injunctive relief against enforcement of the State criminal statute were not demonstrated. The plaintiffs now are not pressing for injunctive relief, and have stated at argument that they are confident a declaratory judgment would be respected by the defendants. I am convinced that there is no impediment here to affording declaratory relief to protect these plaintiffs' rights under the First and Fourteenth Amendments.
 
 
 41
 There is no showing here of any pending proceeding in the State courts involving the merits of plaintiffs' constitutional claim.[1] As noted, the plaintiffs now are seeking only declaratory relief to adjudge the Colorado statute invalid under the First and Fourteenth Amendments and the issue is ripe for determination.[2]
 
 
 42
 I am convinced that declaratory relief is appropriate in these circumstances. Plaintiffs Grant and Hoskins are individuals who are designated representatives of the petition to initiate the proposed constitutional amendment and plaintiff Coloradans For Free Enterprise, Inc. is a corporation supporting the amendment. Additional plaintiffs are registered voters of Colorado and all the plaintiffs allege that they desire to pay persons for their time and labor in circulating the petitions. I R. 2; see also II R. 13, 36. The plaintiffs are therefore parties "against whom these criminal statutes directly operate ...." Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973). "Moreover, the State has not disavowed any intention of invoking the criminal penalty provision ..." against these plaintiffs, Babbitt v. United Farm Workers National Union, 442 U.S. 289, 302, 99 S.Ct. 2301, 2310, 60 L.Ed.2d 895 (1979), and the State here is vigorously upholding the statute in direct litigation with these plaintiffs. "[W]hen fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative, a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.' " Id. (quoting Steffel v. Thompson, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974)).
 
 
 43
 I feel, therefore, that these plaintiffs have standing to seek declaratory relief to vindicate their constitutional claim under the First and Fourteenth Amendments and that the federal court should not abstain in these circumstances from entering a proper declaratory judgment on the constitutional claim. Indeed, in Steffel v. Thompson, 415 U.S. at 469, 94 S.Ct. at 1220, in determining that declaratory relief was proper in light of the principles in Younger v. Harris, and Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), the Court pointed out that in Doe v. Bolton the Court had "affirmed the issuance of declaratory judgments of unconstitutionality, anticipating that these [criminal abortion statutes] would be given effect by the state authorities." In Doe v. Bolton, 410 U.S. at 188, 93 S.Ct. at 745, the Court held that physicians had standing to challenge the abortion statutes "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes."
 
 
 44
 Thus, the plaintiffs have standing to assert their constitutional claim, and this is a proper case in which a declaratory judgment should be granted.
 
 II
 
 45
 My basic disagreement on the merits is that the Colorado statute infringes essential rights of political communication protected by the First and Fourteenth Amendments as those rights are recognized in recent decisions of the Supreme Court. The statute applies restrictions that are impermissibly broad in seeking to promote the State's asserted interests.
 
 
 46
 The critical facts are not in dispute. The individual plaintiffs are registered voters in Colorado and two of them are designated representatives of a petition to initiate a proposed amendment to the Constitution of Colorado. Plaintiff Coloradans for Free Enterprise, Inc. is a corporation organized under State law which supports the proposed constitutional amendment. The proposed amendment provides basically for the removal of motor carriers from the jurisdiction of the State Public Utilities Commission.
 
 
 47
 In order for the initiative measure to be placed on the November 1984 ballot, the proponents must obtain signatures of 46,737 registered voters on petitions supporting the measure before August 6, 1984. Plaintiffs wish to pay persons for circulating the petitions, but are prohibited from doing so by Colo.Rev.Stat. Sec. 1-40-110 (1980),[4] which makes the payment to circulators of petitions a criminal offense.[5] Plaintiffs brought suit, claiming that the statute violates their rights to free speech and political association by limiting the pool of available petition circulators to those willing and financially able to contribute their time on a volunteer basis; this reduction in the available pool, they argued, serves to reduce significantly the ability of the initiative sponsors to communicate with the Colorado electorate, and thus substantially impedes the free flow of political ideas.
 
 
 48
 The district court rejected plaintiffs' claim, finding that the statute does not impose a burden on their right to free speech. The court stated that plaintiffs are not restricted in the personal communication of their belief in the proposition; that their ability to spend money on every other form of thought dissemination is totally unfettered; and that the statute only restricts generalized support for political thought, much as the contribution of money was regarded in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). The court also "[took] seriously" the State's interests sought to be achieved by the statute--(1) protecting the integrity of the initiative process, and (2) insuring a broad base of support for any initiated measure.
 
 
 49
 In discussing the first asserted state interest, the court found that the testimony lends credence to the State's contentions that paid circulators would be persuaded to use sales techniques, not inherently illegal, just to enhance their own compensation. The court also referred to testimony of an incident in Florida where circulators padded petitions with names taken from a telephone book, and cited evidence showing that no effort is made in Colorado to verify the validity of signatures except on the filing of written objections.
 
 
 50
 With respect to the second asserted state interest, the court pointed to evidence of the history and limitations of the initiative process as lending ample credence to the State's contention that there is a significant need to insure any measure has a substantial base of support before it is submitted to the electorate. Specifically, the court pointed out that the initiative process started in the West as a "grassroots" means of protecting citizens from overpowering special interest groups, and that this process is relatively rigid in practice, in that once the measure is submitted to State officers for review and presented to the public, it cannot be changed in any way.
 
 
 51
 On this basis, the trial court concluded that plaintiffs failed to demonstrate their entitlement to relief and entered judgment in favor of defendants.
 
 III
 
 52
 I cannot agree that the evidence is sufficient to support the district court's finding that the Colorado statute does not impose a burden on plaintiffs' right to free speech.[6] The record evidence shows without dispute that a petition circulator, in obtaining signatures to a petition, engages in the communication of political ideas. The circulator approaches a stranger, asks him if he is a registered voter, and, if the person is willing to listen, advances arguments why the petition should be placed on the ballot.[7] See II R. 10-12, 43. This process of soliciting signatures is therefore closely intertwined with a discussion of the merits of the measure. See Libertarian Party of Oregon v. Paulus, Civ. No. 82-521FR, slip op. at 4 (D.Ore. Sept. 3, 1982); Hardie v. Fong Eu, 18 Cal.3d 371, 556 P.2d 301, 303, 134 Cal.Rptr. 201, 203 (1976), cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 360 (1977); cf. Secretary of State of Maryland v. Joseph H. Munson Co., --- U.S. ----, ---- - ----, 104 S.Ct. 2839, 2847-49, 81 L.Ed.2d 786 (1984) (in Village of Schaumburg v. Citizens For a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), Court determined that charitable solicitations are so intertwined with speech that they are entitled to protection of First Amendment).
 
 
 53
 The record also establishes that the available pool of petitioners will be less if they cannot be compensated for their work. The district court itself acknowledged that "the evidence indicates plaintiffs' purposes would be enhanced if the corps of volunteers could be augmented by a cadre of paid workers." I R. 38; see also Urevich v. Woodward, 667 P.2d 760, 763 (Colo.1983) ("We can take judicial notice of the fact that it is often more difficult to get people to work without compensation than it is to get them to work for pay."). The simple fact is that people must earn a living and only a limited number of individuals can afford to devote the substantial amounts of time that may be necessary to collect signatures on a purely volunteer basis.[8] Beyond that, there are limitations as a practical matter on the sponsors' ability to motivate volunteers because of the rejection that petitioning necessarily brings.[9]
 
 
 54
 Thus, the effect of the statute's absolute ban on compensation of solicitors is clear. It impedes the sponsors' opportunity to convey their views to the public. It curtails the discussion of issues that normally accompanies the circulation of initiative petitions. And it shrinks the size of the audience that can be reached. See Libertarian Party of Oregon v. Paulus, slip op. at 4. In short, like the campaign expenditure limitations struck down in Buckley, the Colorado statute imposes a direct quantity restriction on political speech--a restriction which "necessarily reduces the quantity of expression ...." Buckley, 424 U.S. at 19, 96 S.Ct. at 634.
 
 
 55
 In light of these restrictions on communication, it is incumbent on the State to show that the governmental interests advanced in its support satisfy the "exacting scrutiny" applicable to limitations on core First Amendment rights of political expression. See Buckley, 424 U.S. at 44-45, 47-48, 96 S.Ct. at 646-647, 648-649. I cannot agree that any such showing has been made here.
 
 
 56
 First, I cannot accept the district court's initial rationale for upholding the ban on payment of petition circulators--i.e., protection of the integrity of the initiative process. Although the State has every right to take strong measures to prevent overreaching, improper offers of consideration for signatures, fraudulent signatures and other fraudulent or dishonest activities by petition circulators, the State may do so only by measures tailored to attack those problems, within clearly recognized areas permitted by the Supreme Court. This is borne out fully by the teachings of the Court's recent opinions. Solicitation of signatures for the ballot measure "... is not so inherently conducive to fraud and overreaching as to justify its prohibition." Village of Schaumburg v. Citizens For a Better Environment, 444 U.S. 620, 637-38 n. 11, 100 S.Ct. 826, 836-39 n. 11, 63 L.Ed.2d 73 (1980). The broad intrusion banning the use of paid circulators entirely is not tailored to the least intrusive remedy, as the Court's opinions demand. This statute, which so broadly bans communication by paid solicitors, cannot stand under the Supreme Court's recent First Amendment decisions. Moreover, those decisions afford special protection to free and open communication in support of ballot measures. The Court has pointed out that improper influences resulting from contributions and expenditures for candidates are a danger of a greater magnitude than those made in support of particular issues or ballot measures.
 
 
 57
 The district court likened the Colorado statute to a restriction on contributions, one not unconstitutionally onerous under Buckley. I R. 40. I cannot agree with this classification because it is the plaintiffs' expenditures to pay circulators of plaintiffs' own specific ballot measure, which are banned. Thus, the plaintiffs' payments to the circulators are not an expression resting "solely on the undifferentiated, symbolic act of contributing." Buckley, 424 U.S. at 21, 96 S.Ct. at 635. However, even if we assume that the statute could correctly be classified as a ban on contributions, it cannot stand. The Court's recent focus on the protection of efforts in support of ballot measures--whether by contributions or expenditures--makes this plain.
 
 
 58
 In Citizens Against Rent Control/Coalition For Fair Housing v. City of Berkeley, California, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), the Court invalidated a city ordinance that limited contributions to committees formed to support or oppose ballot measures. Distinguishing its holding in Buckley which sustained limitations on political contributions to a candidate, the Court stated that:
 
 
 59
 Buckley identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a candidate ....
 
 
 60
 ... Buckley does not support limitations on contributions to committees formed to favor or oppose ballot measures.
 
 
 61
 Berkeley, 454 U.S. at 296-97, 102 S.Ct. at 437 (emphasis in original).
 
 
 62
 In discussing the ordinance's impermissible restraint on the freedom of expression, the Court noted that by limiting contributions the ordinance "automatically affects expenditures" and that "limits on expenditures operate as a direct restraint on freedom of expression" of groups engaging in ballot measure campaigns. Id. at 299, 102 S.Ct. at 439. Distinguishing candidate and ballot measure campaigns, the Court emphatically concluded that "there is no significant state or public interest in curtailing debate and discussion of a ballot measure." Id. The Court reasoned that the integrity of the political system would be adequately protected by alternative means such as public disclosure or the outlawing of anonymous contributions. Id. at 299-300, 102 S.Ct. at 439.
 
 
 63
 The distinction between the State's interest in regulating the campaigns of candidates and regulating campaigns for ballot measures was also discussed in First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1976). There the Court struck down a state criminal statute prohibiting corporations from making contributions or expenditures "for the purpose of ... influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation." As noted by the Ninth Circuit in C & C Plywood Corp. v. Hanson, 583 F.2d 421, 424-25 (9th Cir.1978), Bellotti made no distinction between contributions and expenditures in deciding that the statute was unconstitutional, but did, however, draw a clear distinction between ballot issues and partisan elections. The Court observed that:
 
 
 64
 Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections ... simply is not present in a popular vote on a public issue. To be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it: The Constitution "protects expression which is eloquent no less than that which is unconvincing." ... We noted only recently that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment ...."
 
 
 65
 Bellotti, 435 U.S. at 790-91, 98 S.Ct. at 1423 (footnotes and citations omitted); see also Let's Help Florida v. McCrary, 621 F.2d 195, 197, 199-201 (5th Cir.1980) (invalidating Florida statute that restricted size of contributions to any political committee in support of, or opposition to, ballot issues); C & C Plywood Corp. v. Hanson, 583 F.2d at 424-25 (invalidating Montana law that prohibited corporations from making contributions in support of, or opposition to, ballot issues); Schwartz v. Romnes, 495 F.2d 844, 852-53 (2d Cir.1974) (New York statute that prohibited corporate contributions for political purposes must be construed narrowly under First Amendment so that corporations may contribute to referendum campaign).
 
 
 66
 Although the State strenuously argues that it is not asserting a concern about fraud, it seems clear that the State has been compelled to attempt to avoid the Supreme Court's rejection in Buckley of the rationale of preventing fraud. In Buckley the Court held that the prevention of corruption did not constitute an interest sufficiently substantial to warrant the direct infringement of political communication represented by campaign expenditure limitations; that concern could be addressed by other measures. 424 U.S. at 45, 55-56, 96 S.Ct. at 647, 652; cf. Secretary of State of Maryland v. Joseph H. Munson Co., --- U.S. at ---- n. 16, 104 S.Ct. at 2853 n. 16 (concerns about unscrupulous professional fundraisers or about fraudulent charities not a sufficient state interest to justify prohibiting charitable organizations, in connection with fundraising activities, from paying expenses of more than 25% of amount raised; such concerns could be accommodated directly through disclosures and registration requirements and penalties for fraudulent conduct).
 
 
 67
 The State fails to make any substantial argument that the Colorado General Assembly cannot effectively protect the integrity of the initiative process by laws more narrowly tailored to specific abuses. Colorado has existing statutes that make it unlawful to forge a signature on a petition, to make false or misleading statements relating to a petition, or to pay someone to sign a petition. See Colo.Rev.Stat. Secs. 1-13-106, 1-40-119, 1-40-110 (1980). The statutes also require that conspicuous warnings of criminal offenses be printed on every petition (see Appendix hereto), and that circulators attach an affidavit attesting inter alia to the validity of the petition's signatures. See id. Sec. 1-40-106 (Cum.Supp.1983); see also Colo. Const. art. V, Sec. 1. Finally, the Colorado statutes provide for elaborate protest procedures for challenging the sufficiency of any petition, permitting both an administrative determination and an opportunity for judicial review.[10] See Colo.Rev.Stat. Sec. 1-40-109 (Cum.Supp.1983).
 
 
 68
 The State suggests that paid petition circulators may be too persuasive, or use irrelevant arguments, in convincing persons to sign the petitions. It suffices to say that the relative merits of the method of presentation and of the ballot measure itself are for the public to weigh and consider. The First Amendment is a value-free provision whose protection is not dependent on "the truth, popularity, or social utility of the ideas and beliefs which are offered." NAACP v. Button, 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963). "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind .... In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us." Thomas v. Collins, 323 U.S. 516, 545, 65 S.Ct. 315, 329, 89 L.Ed. 430 (1945) (Jackson, J., concurring).
 
 
 69
 Second, I also cannot accept the State's defense of the statute based on its assertion of a "compelling" interest in requiring that an initiative have a wide base of public support before an initiative is placed on the ballot. This argument ignores the requirement in Colo.Rev.Stat. Sec. 1-40-105 (Cum.Supp.1983) that a petition be signed by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of Secretary of State at the previous general election. Such requirement for petition signatures, which in this case calls for a minimum of 46,737 signatures of registered voters, protects the State's interest in requiring a broad base of popular support. Further, as noted above, the validity of the required number of signatures can be reviewed in administrative and judicial proceedings questioning the signatures.
 
 IV
 
 70
 I am particularly persuaded by the analysis of other courts which have struck down similar restrictions on the payment of petition circulators as invalid under the First and Fourteenth Amendments.
 
 
 71
 It is true that in State v. Conifer Enterprises, Inc., 82 Wash.2d 94, 508 P.2d 149 (1973), the Washington Supreme Court held that a Washington statute prohibiting payment of petition circulators did not violate the First Amendment. However, that case was decided before Buckley and was based on the Washington court's finding that while the solicitation of signatures on an initiative petition is political expression protected by the First Amendment, there is no necessary relationship between the payment of circulators and the exercise of that right. 508 P.2d at 153. Buckley rejected this theory, stating that:
 
 
 72
 "[a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money."
 
 
 73
 424 U.S. at 19, 96 S.Ct. at 634 (footnote omitted).
 
 
 74
 In Libertarian Party of Oregon v. Paulus, Civ. No. 82-521FR (D.Ore. Sept. 3, 1982), the federal district court invalidated an Oregon statute prohibiting payment to petition circulators as violating the plaintiffs' First Amendment rights, relying primarily on Buckley. The court held that the statute restricted political speech because obtaining signatures on a nominating petition required the circulator to explain the candidate's views on political issues. The court pointed out that fewer people would undertake the task of circulating petitions if they could not be paid, and that the restraint was not necessary to advance a compelling state interest in preventing fraud, intimidation, or corruption. The court stated that the statute was really an indirect means of dealing with such problems and that the Legislature could deal with corruption in the circulation process by laws more narrowly aimed at specific abuses, as it had by imposing criminal penalties for forging signatures and for misrepresentation during the circulation process. Id. at 4-5.
 
 
 75
 In Hardie v. Fong Eu, 18 Cal.3d 371, 556 P.2d 301, 134 Cal.Rptr. 201 (1976), cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 360 (1977), the California Supreme Court similarly held that a statute limiting the amount that could be spent on the circulation of petitions was unconstitutional. The court relied on Buckley and particularly its recognition that virtually every means of political communication in modern society requires or involves the expenditure of money. 556 P.2d at 303. The court stated that "the process of solicitation of [petition] signatures, of necessity, involves the discussion of the merits of the measure. The circulators themselves thus become unavoidably a principal means of advocacy of the proposal." Id. The court concluded that there remained a demonstrable potential for serious infringement on the right to political communication guaranteed by the First Amendment. Further, the limitations imposed by the statute were not justified by a "compelling" state interest in preventing corruption or in assuring that positions on the ballot could not be bought; corruption could be dealt with effectively by laws more narrowly aimed at specific abuses. Id. at 304.
 
 
 76
 Thus, in two post-Buckley cases dealing with restrictions similar to the one before us, the courts have struck down the restrictions as violative of the First and Fourteenth Amendments.
 
 V
 
 77
 In sum, I conclude that Colo.Rev.Stat. Sec. 1-40-110 invalidly imposes a direct and substantial restriction on plaintiffs' right to political speech, employing unnecessarily broad prohibitions. In the area of free expression, "[p]recision of regulation must be the touchstone ...." NAACP v. Button, 371 U.S. at 438, 83 S.Ct. at 340. Therefore, I would hold that the Colorado statute violates the First and Fourteenth Amendments, and would grant declaratory relief to these plaintiffs.
 
 APPENDIX
 
 78
 "WARNING IT IS AGAINST THE LAW:
 
 
 79
 For anyone to sign any initiative or referendum petition with any name other than his or her own or to knowingly sign his or her name more than once for the same measure or to knowingly sign such petition when not a registered elector.
 
 
 80
 DO NOT SIGN THIS PETITION UNLESS YOU ARE A REGISTERED ELECTOR
 
 
 81
 TO BE A REGISTERED ELECTOR, YOU MUST BE A CITIZEN OF COLORADO AND REGISTERED TO VOTE.
 
 
 82
 Do not sign this petition unless you have read or had read to you the proposed initiative or referred measure or the summary of an initiated measure in its entirety and understand its meaning."
 
 PETITION TO INITIATE
 
 83
 TO: The Honorable Natalie Meyer, Secretary of the State of Colorado.
 
 
 84
 We, the undersigned, registered electors of the State of Colorado respectfully order and demand that: The following proposed Amendment to the Constitution of the State of Colorado shall be submitted to the voters for their adoption or rejection at the polls at the next general election to be held on Tuesday, November 6, 1984, and each of the signers also states:
 
 
 85
 I sign this petition in my own proper person only, and I am a registered elector of the State of Colorado: My residence address and the date of signing this petition are correctly written after my name and I designate the following persons to represent me in all matters affecting this petition.
 
 
 86
 Paul Grant, 6541 Kilimanjaro, Evergreen, Colorado 80439
 
 
 87
 Brian Erickson, 2685 South Dayton Way, # 262, Denver, Colorado 80231
 
 
 88
 Edward Hoskins, 150 South Clarkson Street, # 308, Denver, Colorado 80209
 
 
 89
 The title to the proposed initiative to the Constitution petitioned for herein, as designated by the Secretary of State, Attorney General, and Director of the Legislative Drafting Office, (hereafter to be referred to as the Board), is as follows, to wit:
 
 
 90
 AN AMENDMENT TO ARTICLE XXV OF THE COLORADO CONSTITUTION PROHIBITING REGULATION, AS PUBLIC UTILITIES, OF PERSONS AND BUSINESSES WHICH TRANSPORT PEOPLE OR PROPERTY FOR COMPENSATION.
 
 APPENDIX
 
 91
 "WARNING IT IS AGAINST THE LAW:
 
 
 92
 For anyone to sign any initiative or referendum petition with any name other than his or her own or to knowingly sign his or her name more than once for the same measure or to knowingly sign such petition when not a registered elector.
 
 
 93
 DO NOT SIGN THIS PETITION UNLESS YOU ARE A REGISTERED ELECTOR
 
 
 94
 TO BE A REGISTERED ELECTOR, YOU MUST BE A CITIZEN OF COLORADO AND REGISTERED TO VOTE.
 
 
 95
 Do not sign this petition unless you have read or had read to you the proposed initiative or referred measure or the summary of an initiated measure in its entirety and understand its meaning."
 
 
 96
 The proposed initiated AMENDMENT TO THE CONSTITUTION OF THE STATE OF COLORADO is as follows:
 
 
 97
 Be It Enacted by the People of the State of Colorado: Article XXV of the Constitution of the State of Colorado is amended by the addition of a sentence to the end of the first paragraph to read:
 
 
 98
 "Effective January 1, 1985, no person, corporation, or other legally recognized business entity engaged in the transportation of persons or property for compensation, shall be defined as public utilities, nor shall they be regulated as such."
 
 
 99
 The summary to the proposed initiative as designated by the Board is as follows:
 
 
 100
 Effective January 1, 1985, no one engaged in transporting persons or property for compensation would be defined or regulated as a public utility.
 
 
 101
 In the 1985-86 fiscal year, it is estimated that the measure would reduce state expenditures by approximately $2,000,000.00 and would reduce state revenues by approximately $1,500,000.00.
 
 
 102
 The ballot title and submission clause as designated and fixed by the Board is:
 
 
 
 SHALL THERE BE AN AMENDMENT TO
 ARTICLE XXV OF THE COLORADO YES
 CONSTITUTION TO PROHIBIT REGULATION, ------
 AS PUBLIC UTILITIES, OF PERSONS
 AND BUSINESSES WHICH TRANSPORT
 PEOPLE OR PROPERTY FOR NO
 COMPENSATION?
 
 
 APPENDIX
 
 103
 "WARNING IT IS AGAINST THE LAW:
 
 
 104
 For anyone to sign any initiative or referendum petition with any name other than his or her own or to knowingly sign his or her name more than once for the same measure or to knowingly sign such petition when not a registered elector.
 
 
 105
 DO NOT SIGN THIS PETITION UNLESS YOU ARE A REGISTERED ELECTOR
 
 
 106
 TO BE A REGISTERED ELECTOR, YOU MUST BE A CITIZEN OF COLORADO AND REGISTERED TO VOTE.
 
 
 107
 Do not sign this petition unless you have read or had read to you the proposed initiative or referred measure or the summary of an initiated measure in its entirety and understand its meaning."
 
 
 108
 --------------------------------------------------------------------------
 PRINTED NAME OF SIGNATURE OF CITY OR TOWN DATE
 ............
 ELECTOR ELECTOR STREET AND NUMBER COUNTY SIGNED
 ----------------------------------------------------------------------
--------------------------------------------------------------------------
 1 ................. ............
--------------------------------------------------------------------------
 2 ................. ............
--------------------------------------------------------------------------
 3 ................. ............
--------------------------------------------------------------------------
 4 ................. ............
--------------------------------------------------------------------------
 5 ................. ............
--------------------------------------------------------------------------
 6 ................. ............
--------------------------------------------------------------------------
 7 ................. ............
--------------------------------------------------------------------------
 8 ................. ............
--------------------------------------------------------------------------
 9 ................. ............
--------------------------------------------------------------------------
10 ................. ............
--------------------------------------------------------------------------
 
 APPENDIX
 
 109
 AFFIDAVIT OF CIRCULATOR STATE OF COLORADO COUNTY OF _ _ _
 
 
 110
 I, being first duly sworn, depose and say; I am a registered elector of the State of Colorado and my address is _ _ _
 
 
 111
 I have circulated the foregoing petition and each signature thereon was affixed in my presence; and each signature thereon is the signature of the person whose name it purports to be, and to the best of my knowledge and belief each of the persons signing said petition was at the time of such signing a qualified elector of the State of Colorado; I have neither received nor have I entered into any contract whereby I will in the future receive any money or other thing of value in consideration of or as an inducement to the circulation of the above petition by me; I have not nor will I pay in the future and I believe that no other person has so paid or will pay, directly or indirectly, any money or other thing of value to any signer for the purpose of inducing or causing such signer to affix his signature to such petition.
 
 
 
 (Signature of Circulator)
 Subscribed and sworn to before me in the county of ____________________, state of Colorado, this ________ day of ________________, 19 ______.
 My commission expires -------
 
 
 Notary Public Address
 
 
 [1]
 For a more detailed exposition of the right of initiative in Colorado, see Colorado Project-Common Cause v. Anderson, 178 Colo. 1, 495 P.2d 220
 
 
 [2]
 Plaintiffs have asserted the compelling interest of the state is in preventing fraud in the process, but that is not the state's position at all
 
 
 [1]
 We are advised by plaintiffs that "[s]ince the District Court decision, the Colorado Secretary of State has served notice of a hearing to determine whether there has been a violation by one of the Plaintiffs of the statute in question." Brief of Appellants 10. This is not, however, a pending state court proceeding in which the plaintiffs' constitutional claims are involved
 
 
 [2]
 Plaintiffs also request that this court extend the time period within which they must file their petition or, alternatively, that it order the Secretary of State to place this initiative measure on the November ballot. Brief of Appellants 11-12. This relief, however, was not sought before the district court and should not be considered for the first time on appeal. In addition to their prayer for injunctive and declaratory relief, costs and attorney's fees, there was a general prayer for relief, but I do not deem this sufficient to present a claim for the special relief of extending the time for circulation of the petitions or ordering the measure placed on the ballot
 
 
 [4]
 Colo.Rev.Stat. Sec. 1-40-110, as enacted, provides:
 Any person, corporation, or association of persons who directly or indirectly pays to or receives from or agrees to pay to or receive from any other person, corporation, or association of persons any money or other thing of value in consideration of or as an inducement to the circulation of any initiative or referendum petition or in consideration of or as an inducement to the signing of any such petition commits a class 5 felony and shall be punished as provided in section 18-1-105, C.R.S. 1973.
 This statute has been challenged at least once since its enactment. In Urevich v. Woodard, 667 P.2d 760 (Colo.1983), the Supreme Court of Colorado held that "the language of section 1-40-110 is too broad to survive strict scrutiny" with respect to the right of initiative under the Colorado Constitution and accordingly deleted the word "inducement" from the statute. Id. at 763-64. The court did not express any view on the propriety of the regulation of "consideration." Id. at 763.
 
 
 [5]
 Violation of the statute is a class 5 felony, which is punishable by one to two years' imprisonment plus one year of parole as the "presumptive" range of penalties. Colo.Rev.Stat. Sec. 18-1-105 (Cum.Supp.1983)
 
 
 [6]
 The district court also improperly considered the availability of other channels of communication in its analysis. This factor only becomes relevant in measuring the reasonableness of time, place, and manner regulations. See, e.g., Clark v. Community for Creative Non-Violence, --- U.S. ----, ----, 104 S.Ct. 3065, 3068, 82 L.Ed.2d 221 (1984). The statute's ban on the payment of circulators, however, which so directly and substantially restricts plaintiffs' right to political speech, cannot be fairly characterized in those terms. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." Schneider v. State, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939)
 
 
 [7]
 Paul Grant, one of the plaintiffs, gave the following testimony based on his experience as a petition circulator:
 [T]he way that we go about soliciting signatures is that you ask the person--first of all, you interrupt the person in their walk or whatever they are doing. You intrude upon them and ask them, "Are you a registered voter?"
 Many people say, "I haven't got time, don't bother me," or "Yes, I am, but it is none of your business," or "Yes, I am, so what?"
 If you get a yes, then you tell the person your purpose, that you are circulating a petition to qualify the issue on the ballot in November, and tell them what about, and they say, "Please let me know a little bit more." Typically, that takes maybe a minute or two, the process of explaining to the persons that you are trying to put the initiative on the ballot to exempt Colorado transportation from PUC regulations.
 Then you ask the person if they will sign your petition. If they hesitate, you try to come up with additional arguments to get them to sign ....
 ....
 [We] [t]ried to explain the not just deregulation in this industry, that it would free up the industry from being cartelized, allowing freedom from moral choices, price competition for the first time, lowering price costs, which we estimate prices in Colorado to be $150 million a year in monopoly benefits. We have tried to convey the unfairness and injustice of the existing system, where some businesses are denied to go into business simply to protect the profits of existing companies.
 We tried to convey the unfairness of the existing system, which has denied individuals the right to start their own businesses. In many cases, individuals have asked for an authority and been turned down because huge corporate organizations have opposed them.
 II R.10-11.
 
 
 [8]
 Paul Grant testified:
 Money is very definitely a motivating factor to get someone to work on behalf of an effort, a matter of raising the demand and you get more supply. You pay people. You pay them more. You get more people able and willing to do it. Many of the people that I work with in the Coloradans for Free Enterprise, most of them--well, the majority of the people I work with in the Libertarian Party are people who have jobs, and they either have jobs or don't have jobs. If they do have jobs, they can't afford to take time off to work on the drive. If they don't have jobs, and they are looking for them, they can't afford to be volunteers. So money either enables people to forego leaving a job, or enables them to have a job.
 II R. 19-20.
 
 
 [9]
 Lori Massie, director of recruitment for the ballot drive, testified:
 A petition circulator can very easily be motivated by money. If he knows he can collect money for his efforts, he is far more likely to spend six hours a day at it, than he would otherwise. The way it is right now, it is kind of a painful process to go out there and stand and ask people to sign something, and after an hour of being beaten over the head with "no's" or "drop dead" or whatever, if they were being paid and they knew that their success would relate to their pay, they would work on it. They would probably polish up their techniques also.
 II R.34.
 
 
 [10]
 For examples of judicial review of ballot measures in Colorado and other jurisdictions, see Billings v. Buchanan, 192 Colo. 32, 555 P.2d 176, 176-79 (1976); Case v. Morrison, 118 Colo. 517, 197 P.2d 621, 621-24 (1948); Haraway v. Armstrong, 95 Colo. 398, 36 P.2d 456, 457-58 (1934); Miller v. Armstrong, 84 Colo. 416, 270 P. 877, 878-79 (1928); Oklahomans for Modern Alcoholic Beverage Controls v. Shelton, 501 P.2d 1089, 1091-95 (Okla.1972); In re Referendum Petition No. 18 State Question No. 437, 417 P.2d 295, 296-98 (Okla.1966); Community Gas & Service Co. v. Walbaum, 404 P.2d 1014, 1015-17 (Okla.1965)