Paul K. GRANT, Edward Hoskins, Nancy P. Bigbee, Lori A. Massie, Ralph R. Harrison, Coloradans for Free Enterprise, Inc., a Colorado corporation, Plaintiffs-Appellants,

v.

Natalie MEYER, in her official capacity as Colorado Secretary of State, and Duane Woodard, Colorado Attorney General, Defendants-Appellees.

No. 84–1949.

United States Court of Appeals, Tenth Circuit.

Sept. 2, 1987.

William C. Danks, Denver, Colo., for plaintiffs-appellants.

Maurice G. Knaizer, First Asst. Atty. Gen., Denver, Colo., for defendants-appellees.

Before HOLLOWAY, Chief Judge, and BARRETT, McKAY, LOGAN, SEYMOUR, ANDERSON, TACHA and BALDOCK, Circuit Judges.

## OPINION ON REHEARING EN BANC

HOLLOWAY, Chief Judge.

This appeal involves the constitutionality, under the First and Fourteenth Amendments, of Colo.Rev.Stat. § 1–40–110 (1980)[1] which makes it a criminal offense[2] to pay any consideration for the circulation of initiative or referendum petitions.

The plaintiffs initiated a petition to amend the Colorado Constitution by removing motor carriers from the jurisdiction of the State Public Utilities Commission. In order to obtain the required number of signatures, the plaintiffs wished to pay other individuals to circulate the petitions. Plaintiffs brought suit under 42 U.S.C. § 1983 (1982) claiming that the statutory prohibition against such payment violates their rights of free speech and political association. The district court rejected the

1. Colo.Rev.Stat. § 1–40–110, as enacted, provides:

> Any person, corporation, or association of persons who directly or indirectly pays to or receives from or agrees to pay to or receive from any other person, corporation, or association of persons any money or other thing of value in consideration of or as an inducement to the circulation of any initiative or referendum petition or in consideration of or as an inducement to the signing of any such petition commits a class 5 felony and shall be punished as provided in section 18–1–105, C.R.S. 1973.

This statute has been challenged on several occasions since its enactment. In *Urevich v. Woodard,* 667 P.2d 760 (Colo.1983), the Supreme Court of Colorado held that "the language of section 1–40–110 is too broad to survive strict scrutiny" with respect to the right of initiative under the Colorado Constitution and accordingly narrowed the statute by construction to delete the word "inducement." *Id.* at 763–64. The court did not express any view on the propriety of the regulation of "consideration." *Id.* at 763.

We also note that a group of Colorado residents recently filed an action in the Colorado courts, arguing that Colo.Rev.Stat. § 1–40–110 does not apply to the circulation of a referendum seeking the repeal of a city ordinance. In the alternative, the plaintiffs argued that if the statute was applicable to their referendum, then it was in violation of their state constitutional rights to free speech, free assembly and petition, freedom of association and power of referendum. *Hermes v. City of Commerce City,* No. 86–CV–2203, Verified Complaint at 3–6 (D.Ct. Adams County, Colo., Sept. 17, 1986). The trial judge agreed and held that the statu-

tory ban against payment of petition circulators is unconstitutional. *Hermes v. City of Commerce City,* No. 86–Civ–2203, Reporter's Transcript at 5–7 (D.Ct. Adams County, Colo., Oct. 31, 1986). Some of the defendants appealed the district judge's ruling to the Supreme Court of Colorado on December 3, 1986. *Ford v. City of Commerce City,* No. 86–SA–459 (Colo. Dec. 3, 1986) (Notice of Appeal). However, the City Council apparently voted to repeal the ordinance in question slightly more than one month later, and the plaintiffs accordingly moved to dismiss the appeal as moot. *Ford v. City of Commerce City,* No. 86–SA–459, Motion to Dismiss Appeal or in the Alternative for an Extension of Time at 1, 2 ¶ 1 (Colo. July 15, 1987). The Supreme Court of Colorado granted the motion to dismiss the appeal on July 23, 1987. *Ford v. City of Commerce City,* No. 86–SA–459 (Colo. filed July 24, 1987).

Finally, we note that the same group of plaintiffs filed a related action in federal district court which raised similar claims based on federal constitutional law. *Hermes v. Commerce City,* No. 86–Z–1883 (D.Colo. filed Sept. 12, 1986). Although there has been no final ruling in that case, the plaintiffs have stated in their briefs to the Supreme Court of Colorado that they would ask the federal district court to dismiss the action if the state appeal was found to be moot. *Ford v. City of Commerce City,* No. 86–SA–459, Reply to Objection to Motion to Dismiss Appeal at 2 (Colo. received July 23, 1987).

2. Violation of the statute is a class 5 felony, which is punishable by one to two years' imprisonment plus one year of parole as the "presumptive" range of penalties. Colo.Rev.Stat. § 18–1–105 (1986 cum.supp.).

constitutional claim. A divided panel of this court affirmed, adopting the opinion of the district court. 741 F.2d 1210, 1211 (10th Cir.1984) (per curiam). We granted rehearing en banc and vacated the panel opinion. 780 F.2d 848 (10th Cir.1985). After consideration of supplemental briefs and reargument to the court en banc, we now reverse.

## I

The critical facts are not in dispute. Colorado is one of 23 states to allow its citizens to place propositions on the ballot through the initiative process. Colo. Const. art. V, § 1; Colo.Rev.Stat. § 1-40-101 et seq. (1980); *see* Defendant's Exhibit E ("Initiative Provisions by State"). Under Colorado law, sponsors of the initiative must submit their proposition to the directors of the State Legislative Council and Drafting Office for review and comment. The draft is then submitted to a three-member board,[3] which prepares a title, submission clause and summary. The proponents of the initiative then have six months to obtain the necessary signatures and file the petition with the Secretary of State.[4] If these requirements are met, the submission clause will appear on the ballot at the next general election. Colo.Rev.Stat. § 1-40-101-105 (1980 & 1986 cum. supp.); *Dye v. Baker*, 143 Colo. 458, 354 P.2d 498, 500 (1960).

The plaintiffs submitted their initiative measure to the Secretary of State, and set out to obtain the required 46,737 signatures of registered voters. When the trial began the plaintiffs had slightly over one month remaining to obtain approximately 30,000 more signatures.

## II

We have considered, *sua sponte,* several questions relating to the justiciability of the constitutional issue presented: (1) the desirability of abstention because of the criminal sanctions in the Colorado statute banning the payment of initiative petition circulators; (2) the question of ripeness since the plaintiffs have not yet been prosecuted for violating the Colorado statute; and (3) the possibility that the appeal is moot since the November 1984 election, which was originally in question, has already passed. We conclude that we should decide the merits of the appeal.

### A.

 We feel that abstention is not proper here. In opposing an injunction pending appeal, the State's memorandum cited *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *inter alia,* arguing that grounds for injunctive relief against enforcement of the State criminal statute were not demonstrated. On appeal, however, the plaintiffs have omitted their prayer for injunctive relief, expressing confidence that a declaratory judgment would be respected by the defendants. We feel that there is no impediment to affording these plaintiffs declaratory relief in order to vindicate their rights under the First and Fourteenth Amendments.[5]

---

3. The three-member board consists of the Secretary of State, Attorney General, and Director of the Legislative Drafting Office. Colo.Rev.Stat. § 1-40-101(2) (1980).

4. The petition must be "signed by registered electors in an amount equal to at least five percent of the total number of voters who cast votes for all candidates for the office of secretary of state at the preceding general election." Colo.Rev.Stat. § 1-40-105 (1986 cum.supp.).

5. In their petition for rehearing, the plaintiffs requested this court to certify the question of the statute's constitutionality to the Colorado Supreme Court. Petition for Rehearing and Suggestion for Rehearing in Banc at 1 n. 1.

Here, however, certification would be improper since the state statute is unambiguous, *see Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971), and the plaintiffs do not question the statute's validity under state law. *See* Colo.App.R. 21(a). The Supreme Court recently declined a request for certification, stating that "[i]t would be manifestly inappropriate to certify a question in a case where, as here, there is no uncertain question of state law whose resolution might affect the pending federal claim." *City of Houston v. Hill,* —— U.S. ——, ——, 107 S.Ct. 2502, 2514, 96 L.Ed.2d 398 (1987).

## B.

■ We also believe the dispute is ripe despite the absence of a pending criminal prosecution against any of the plaintiffs. The plaintiff class consists of five individuals and a corporation called "Coloradans for Free Enterprise, Inc." The individual plaintiffs are registered voters in Colorado and several of them testified that they wished to pay others for their time and labor in circulating the petitions. Additionally plaintiffs Grant and Hoskins have been designated as representatives of the petition to deregulate Colorado's transportation industry and plaintiff Coloradans for Free Enterprise, Inc., has supported the petition. Plaintiffs' Exhibit 1.

The plaintiffs are therefore parties "against whom these criminal statutes directly operate...." *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973). "Moreover, the State has not disavowed any intention of invoking the criminal penalty provision ..." against these plaintiffs, *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 302, 99 S.Ct. 2301, 2311, 60 L.Ed.2d 895 (1979), and the State here is vigorously upholding the statute in litigation with these plaintiffs. "[W]hen fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative, a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.'" *Id.* (quoting *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974)). Thus the positions of the parties are sufficiently adverse for us to reach the merits of plaintiffs' constitutional claim. *Wilson v. Stocker,* 819 F.2d 943, 946–47 (10th Cir.1987).

## C.

■ We also believe that the appeal is not moot even though the November 1984 general election has passed, as the Court held in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 774–75, 98 S.Ct. 1407, 1414–15, 55 L.Ed.2d 707 (1978). It is well settled that an appeal is not moot if the dispute is "capable of repetition, yet

evading review." *See, e.g., Press-Enterprise Co. v. Superior Court,* 478 U.S. ___, ___, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Under such a rationale two requirements must be met. First, the duration of the challenged action must be too short for completion of litigation prior to its cessation or expiration. Second, there must be a reasonable expectation that the same complaining party will be subjected to the same action again. *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 187, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979); *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975) (per curiam).

■ These requirements are satisfied here. First, Colorado law requires proponents of an initiative to obtain a substantial number of signatures within a six-month period. Even if a proponent could obtain a favorable ruling within that time, he would likely be unable to take advantage of his victory by using paid circulators to obtain the necessary signatures. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 774, 98 S.Ct. 1407, 1414, 55 L.Ed.2d 707 (1978). Second, Colorado continues to prohibit the payment of circulators and the initiative to deregulate Colorado's transportation industry apparently has not yet been enacted. As a result we can reasonably expect that the same dispute will erupt again between the parties. *See id.* at 774–75, 98 S.Ct. at 1414–15; *Mandel v. Bradley,* 432 U.S. 173, 175 n. 1, 97 S.Ct. 2238, 2240 n. 1, 53 L.Ed.2d 199 (1977) (per curiam).

For these reasons we turn to the merits of plaintiffs' constitutional claim.

## III

### A.

As noted, the district court rejected the plaintiffs' claim on the merits, finding that the statute does not impose a burden on their right to free speech. The court stated that plaintiffs are not restricted in the

personal communication of their belief in the proposition; that their ability to spend money on every other form of thought dissemination is totally unfettered; and that the statute only restricts generalized support for political thought, much as the contribution of money was regarded in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). The court also "[took] seriously" the State's interests sought to be achieved by the statute—(1) protecting the integrity of the initiative process, and (2) insuring a broad base of support for any initiated measure.

As to the first asserted state interest, the court found that the testimony lends credence to the State's contentions that paid circulators would be persuaded to use sales techniques, not inherently illegal, just to enhance their own compensation. The court also referred to testimony about an incident in Florida where circulators padded petitions with names taken from a telephone book and cited evidence that no effort is made in Colorado to verify the validity of signatures except on the filing of written objections.

With respect to the second asserted state interest, the district court pointed to evidence of the history of the initiative process as supporting the State's contention that there is a significant need to insure any measure has a substantial base of support before it is submitted to the electorate. Specifically, the court pointed out that the initiative process originated in the West as a "grassroots" means of protecting citizens from overpowering special interest groups, and that this process is relatively rigid in practice in that once the measure is submitted to State officers for review and presented to the public, it cannot be changed.

We are convinced that the district court's views cannot be reconciled with the Supreme Court's recent decisions. For example, in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), the Court addressed the constitutionality of limitations on campaign contributions and expenditures imposed by the Federal Election Campaign Act of 1971, as amended in 1974. Pub.L. No. 92–225, § 608, 86 Stat. 3, 9 (1971) *amended by* Pub.L. No. 93–443, § 101, 88 Stat. 1263 (1974). The Court held that the limits on contributions did not violate the contributors' First Amendment rights of free speech or political association. *Id.* at 58, 96 S.Ct. at 653.[6] In doing so, the Court conceded that the statute restricted the quantity of expression available to political contributors, but concluded that the restrictions were justified by the "weighty interests" of limiting the actuality and appearance of corruption resulting from large individual financial contributions. 424 U.S. at 23–38, 96 S.Ct. at 636–44.

However, the Court invalidated various limitations on expenditures, such as the prohibition against individuals or groups spending more than $1000 per year on behalf of a political candidate. Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93–443, § 101(e)(1), 88 Stat. 1263, 1265; *see Buckley*, 424 U.S. at 58, 96 S.Ct. at 653.[7] Stressing that expenditures for candidates are "permeated by First Amendment interests," the Court found that the Government's asserted interests in preventing the actuality or appearance of corruption were inadequate to justify the ceilings on independent expenditures. *Id.* at 39–51, 96 S.Ct. at 644–50. The Court explained:

> The Act's expenditure ceilings impose direct and substantial restraints on the

---

**6.** These limitations included, *inter alia,* a maximum of $1000 on contributions by individuals and groups to candidates and authorized campaign committees, a $5000 limitation on campaign contributions by political committees, and a $25,000 limitation on total contributions by an individual during a calendar year. Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93–443, § 101(b)(1), (2), & (3), 88 Stat. 1263, 1263.

**7.** The Court in *Buckley* also invalidated limitations on the amount a candidate could spend from his personal or family funds, and limitations on overall campaign expenditures by candidates seeking nomination or election for federal office. 424 U.S. at 51–58, 96 S.Ct. at 650–53.

quantity of political speech.... It is clear that a primary effect of these expenditure limitations is to restrict the quantity of campaign speech by individuals, groups, and candidates. The restrictions, while neutral as to the ideas expressed, limit political expression "at the core of our electoral process and of the First Amendment freedoms."

*Id.* at 39, 96 S.Ct. at 644 (quoting *Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968)).

Since 1976 the Court has relied on *Buckley* as authority for the general rule that limits on political expression are contrary to the First Amendment. For example, the Court recently cited on *Buckley* for the proposition "that preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *Federal Election Commission v. National Conservative Political Action Committee,* 470 U.S. 480, 496–97, 105 S.Ct. 1459, 1469, 84 L.Ed.2d 455 (1985). To date the Court has found these governmental interests sufficient to survive exacting scrutiny only when the statute restricts political contributions to a candidate. For example, in *Citizens Against Rent Control/Coalition For Fair Housing v. City of Berkeley, California,* 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), the Court invalidated a city ordinance that limited contributions to committees formed to support or oppose ballot measures, banning any contribution which would cause the total amount contributed by the person to exceed $250. Distinguishing *Buckley,* the Court stated:

> *Buckley* identified a narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a *candidate....* Federal Courts of Appeals have recognized that *Buckley* does not support limitations on contributions to committees formed to favor or oppose *ballot measures.*

*Id.* at 296–97, 102 S.Ct. at 437–38 (emphasis in original).

In discussing the ordinance's impermissible restraint on freedom of expression, the Court noted that by limiting contributions the ordinance "automatically affects expenditures" and that "limits on expenditures operate as a direct restraint on freedom of expression" of groups engaging in ballot measure campaigns. *Id.* at 299, 102 S.Ct. at 439. Distinguishing candidate and ballot measure campaigns, the Court emphatically concluded that *"there is no significant state or public interest in curtailing debate and discussion of a ballot measure." Id.* (emphasis added). The Court reasoned that the integrity of the political system could be adequately protected by alternative means such as public disclosure or a prohibition against anonymous contributions. The Court also pointed out that freedom of association is diluted if it does not include the right to pool money through contributions because funds are essential to effective advocacy. *Id.* at 296, 102 S.Ct. at 437. The ordinance was held invalid as a restraint on both the right of association and of expression protected by the First Amendment. *Id.* at 299–300, 102 S.Ct. at 439.

The distinction between the State's interests in regulating campaigns for candidates and for ballot measures was also discussed in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). There the Court struck down a state criminal statute prohibiting corporations from making contributions or expenditures "for the purpose of ... influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation." As noted by the Ninth Circuit in *C & C Plywood Corp. v. Hanson,* 583 F.2d 421, 424–25 (9th Cir.1978), *Bellotti* made no distinction between contributions and expenditures in deciding that the statute was unconstitutional; however, it did draw a clear distinction between ballot issues and partisan elections. The Court observed that:

> Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections ... simply is not present in a popular vote on a public issue. To

be sure, corporate advertising may influence the outcome of the vote; this would be its purpose. But the fact that advocacy may persuade the electorate is hardly a reason to suppress it: The Constitution "protects expression which is eloquent no less than that which is unconvincing." ... We noted only recently that "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment...."

*Bellotti,* 435 U.S. at 790–91, 98 S.Ct. at 1423 (footnote and citations omitted); *see also Let's Help Florida v. McCrary,* 621 F.2d 195, 197, 199–201 (5th Cir.1980) (invalidating Florida statute that restricted size of contributions to any political committee in support of, or opposition to, ballot issues); *C & C Plywood Corp. v. Hanson,* 583 F.2d at 424–25 (invalidating Montana law that prohibited corporations from making contributions in support of, or opposition to, ballot issues); *Schwartz v. Romnes,* 495 F.2d 844, 852–53 (2d Cir.1974) (New York statute that prohibited corporate contributions for political purposes must be construed narrowly under First Amendment so that corporations may contribute to referendum campaign).

The clear import of the decisions of the Supreme Court is that restraints on political association and communication, imposed by restrictions on financing of campaigns for ballot measures, are suspect and subject to strict scrutiny. Coloradans for Free Enterprise, Inc., and the individual plaintiffs are barred from reaching out through paid solicitors to contact more of the public. When examined with the exacting scrutiny which the Court's decisions demand, the Colorado ban on compensation of solicitors, as applied to these proponents of the initiative measure, fails since all of the interests which the State suggests in defense of this prohibition are or can be protected by less intrusive measures.

**B.**

As noted, the district court concluded that the Colorado statute does not impose a burden on plaintiffs' right to free speech because they could still personally communicate their belief in the proposition.[8] We think this reasoning cannot be reconciled with *Buckley* and the testimony at trial. The record evidence shows without dispute that a petition circulator, in obtaining signatures to a petition, engages in the communication of political ideas. The circulator approaches a stranger, asks him if he is a registered voter, and, if the person is willing to listen, advances arguments why the petition should be placed on the ballot.[9] *See* II R. 10–12, 43. This process of soliciting signatures is therefore closely intertwined with a discussion of the merits of

---

**8.** The district court also considered the availability of other channels of communication in its analysis. This factor only becomes relevant in measuring the reasonableness of time, place, and manner regulations. *See, e.g., Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The statute's ban on the payment of circulators, however, which so directly and substantially restricts plaintiffs' right to political speech, cannot be fairly characterized in those terms. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939).

**9.** Paul Grant, one of the plaintiffs, gave the following testimony based on his experience as a petition circulator:

[T]he way that we go about soliciting signatures is that you ask the person—first of all, you interrupt the person in their walk or whatever they are doing. You intrude upon them, "Are you a registered voter?"

Many people say, "I haven't got time, don't bother me," or "Yes, I am, but it is none of your business," or "Yes, I am, so what?"

If you get a yes, then you tell the person your purpose, that you are circulating a petition to qualify the issue on the ballot in November, and tell them what about, and they say, "Please let me know a little bit more." Typically, that takes maybe a minute or two, the process of explaining to the persons that you are trying to put the initiative on the ballot to exempt Colorado transportation from PUC regulations.

Then you ask the person if they will sign your petition. If they hesitate, you try to come up with additional arguments to get them to sign. If they don't, you say, "Thanks, have a nice day."

. . . . .

[We] [t]ried to explain the not just deregulation in this industry, that it would free up the industry from being cartelized, allowing freedom from moral choices, price competition for the first time, lowering price costs, which

the measure. *See Ficker v. Montgomery County Board of Elections,* No. R-85-4365, slip op. at 3-4 (D.Md. Dec. 23, 1985); *Clean-Up '84 v. Heinrich,* 590 F.Supp. 928, 930 (M.D.Fla.1984); *Libertarian Party of Oregon v. Paulus,* Civ. No. 82-521FR, slip op. at 4 (D.Ore. Sept. 3, 1982); *Hardie v. Fong Eu,* 18 Cal.3d 371, 134 Cal.Rptr. 201, 556 P.2d 301, 303 (1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 360 (1977); *cf. Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 959, 104 S.Ct. 2839, 2848, 81 L.Ed.2d 786 (1984) (relying on *Village of Schaumburg v. Citizens for A Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), for the proposition that charitable solications are so intertwined with speech that they are entitled to protection of First Amendment).[10]

The record also establishes that the available pool of circulators will be smaller if they cannot be compensated for their work. The district court itself acknowledged that "the evidence indicates plaintiffs' purposes would be enhanced if the corps of volunteers could be augmented by a cadre of paid workers." I R. 38; *see also Urevich v. Woodard,* 667 P.2d 760, 763 (Colo.1983) ("We can take judicial notice of the fact that it is often more difficult to get people to work without compensation than it is to get them to work for pay."). Only a limited number of individuals can afford to devote the substantial amounts of time that may be necessary to collect signatures on a purely volunteer basis.[11] Furthermore there are practical limitations on the sponsors' ability to motivate volunteers because of the rejection that petitioning necessarily brings.[12]

Thus, the effect of the statute's absolute ban on compensation of solicitors is clear.

---

we estimate prices in Colorado to be $150 million a year in monopoly benefits. We have tried to convey the unfairness and injustice of the existing system, where some businesses are denied to go into business simply to protect the profits of existing companies.

We tried to convey the unfairness of the existing system, which has denied individuals the right to start their own businesses. In many cases, individuals have asked for an authority and been turned down because huge corporate organizations have opposed them. II R. 10-11.

**10.** The defendants argue that petition circulators are "election judges" whose primary duty is to assure the validity of signatures. Appellees Brief on Rehearing at 11; *see Sturdy v. Hall,* 201 Ark. 38, 143 S.W.2d 547, 550 (1940). As a result, the defendants argue, any discussion of the merits of the petition is inconsistent with the circulators' governmental responsibilities.

We find the argument unconvincing. Apart from counsel's post-hoc assertions before this court, we find no evidence that the Colorado legislature intended for the solicitation process to be devoid of political advocacy. *See* P. Starr, *The Initiative and Referendum in Colorado* 9-21 (Aug. 11, 1958) (Master's Thesis) (reviewing history of Colorado's adoption of the initiative procedure). It is true that the Government has a special interest in regulating the speech of its employees, *see United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973) (quoting *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)); but we do not think that petition circulators can be fairly characterized in this manner.

**11.** Paul Grant testified:

Money is very definitely a motivating factor to get someone to work on behalf of an effort, a matter of raising the demand and you get more supply. You pay people. You pay them more. You get more people able and willing to do it. Many of the people that I work with in the Coloradans for Free Enterprise, most of them—well, the majority of the people I work with in the Libertarian Party are people who have jobs, and they either have jobs or don't have jobs. If they do have jobs, they can't afford to take time off to work on the drive. If they don't have jobs, and they are looking for them, they can't afford to be volunteers. So money either enables people to forego leaving a job, or enables them to have a job. II R. 19-20.

**12.** Lori Massie, Director of Recruitment for the ballot drive, testified:

A petition circulator can very easily be motivated by money. If he knows he can collect money for his efforts, he is far more likely to spend six hours a day at it, than he would otherwise. The way it is right now, it is kind of a painful process to go out there and stand and ask people to sign something, and after an hour of being beaten over the head with "no's" or "drop dead" or whatever, if they were being paid and they knew that their success would relate to their pay, they would work on it. They would probably polish up their techniques also. II R. 34.

It impedes the sponsors' opportunity to disseminate their views to the public. It curtails the discussion of issues that normally accompanies the circulation of initiative petitions. And it shrinks the size of the audience that can be reached. *See Ficker v. Montgomery County Board of Elections,* slip op. at 5; *Libertarian Party of Oregon v. Paulus,* slip op. at 4. In short, like the campaign expenditure limitations struck down in *Buckley,* the Colorado statute imposes a direct restriction which "necessarily reduces the quantity of expression...." *Buckley,* 424 U.S. at 19, 96 S.Ct. at 634.

### C.

In light of the Colorado statute's restriction on plaintiffs' political expression and their efforts to communicate through petition circulators they would employ, it is incumbent on the State to show that the governmental interests suggested satisfy the exacting scrutiny given to limitations on core First Amendment rights of political expression. *See Buckley,* 424 U.S. at 44–45, 47–48, 96 S.Ct. at 646–47, 648–49. No such showing has been made here.

First, we cannot accept the district court's initial rationale for upholding the ban on payment of petition circulators—*i.e.,* protection of the integrity of the initiative process. Although the State has every right to take strong measures to prevent overreaching, improper offers of consideration for signatures, fraudulent signatures and other dishonest activities by petition circulators, the State may do so only by measures tailored to attack those problems within clearly recognized areas permitted by the Supreme Court. This is borne out by the teachings of the Court's recent opinions. Solicitation of signatures for the ballot measure "is not so inherently conducive to fraud and overreaching as to justify its prohibition." *Village of Schaumburg v. Citizens For a Better Environment,* 444 U.S. 620, 637–38 n. 11, 100 S.Ct. 826, 836 n. 11, 63 L.Ed.2d 73 (1980). The broad intrusion banning the use of paid circulators entirely is not tailored to the least intrusive remedy, as *Buckley* and its progeny demand.

Although the State strenuously argues that it is not asserting a concern about fraud, it seems clear that the State has been compelled to attempt to avoid the Court's rejection in *Buckley* of the rationale of preventing fraud. *Buckley* held that the prevention of corruption did not constitute an interest sufficiently substantial to warrant the direct infringement of political communication represented by campaign expenditure limitations; that concern could be addressed by other measures. 424 U.S. at 45, 55–56, 96 S.Ct. at 652; *cf. Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947 at 967–68 n. 16, 104 S.Ct. at 2852–53 n. 16, 81 L.Ed.2d 786 (1984) (concerns about unscrupulous professional fundraisers or fraudulent charities not a sufficient state interest to justify prohibiting charitable organizations, in connection with fundraising activities, from paying expenses of more than 25% of amount raised; such concerns could be accommodated directly through disclosure and registration requirements and penalties for fraudulent conduct).

The State makes no showing that the Colorado General Assembly cannot effectively protect the integrity of the initiative process by laws more narrowly tailored to specific abuses. Colorado has existing statutes that make it unlawful to forge a signature on a petition, to make false or misleading statements relating to a petition, or to pay someone to sign a petition. *See* Colo.Rev.Stat. §§ 1–13–106, 1–40–119, 1–40–110 (1980). The statutes also require that conspicuous warnings of criminal offenses be printed on every petition and that circulators attach an affidavit attesting, *inter alia,* to the validity of the petition's signatures. *See* Colo.Rev.Stat. § 1–40–106 (1986 cum.supp.); *see also* Colo. Const. art. V, § 1. Finally, the Colorado statutes provide elaborate protest procedures for challenging the sufficiency of signatures on any petition, permitting both an administrative determination and an opportunity for judicial review.[13] *See* Colo.Rev.Stat. § 1–

---

**13.** For examples of judicial review of ballot measures in Colorado, see *Spelts v. Klausing,*

40–109 (1986 cum.supp.). Thus the State's "legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition or solicitation" by paid circulators of petitions. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. at 637, 100 S.Ct. at 836.

The State suggests that paid petition circulators may be too persuasive, or use irrelevant arguments, in convincing persons to sign the petitions. It suffices to say that the relative merits of the method of presentation and of the ballot measure itself are for the public to weigh and consider. The First Amendment is a value-free provision whose protection is not dependent on "the truth, popularity, or social utility of the ideas and beliefs which are offered." *NAACP v. Button*, 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405 (1963). "The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind.... In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us." *Thomas v. Collins*, 323 U.S. 516, 545, 65 S.Ct. 315, 329, 89 L.Ed. 430 (1945) (Jackson, J., concurring).

Second, we cannot accept the State's defense of the statute based on its assertion of a compelling interest in requiring that an initiative have a wide base of public support before an initiative measure is placed on the ballot. This argument ignores the requirement in Colo.Rev.Stat. § 1–40–105 (1986 cum.supp.) that a petition be signed by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of Secretary of State at the previous general election. Such a requirement for petition signatures, which in this case called for a minimum of 46,737 signatures of registered voters, protects the State's interest in requiring a broad base of popular support. *See* Sirico, *The Constitutionality of the Initiative and Referendum*, 65 Iowa L.Rev. 637, 659–63 (1980) ("a legislative act or state constitutional provision presumably sets the requirement [for the number of signatures necessary to place an initiative on the ballot] sufficiently high to limit the plebescite's use to matters in which interest is sufficiently great to justify a check on the representative lawmakers"). Further, as noted above, the validity of the required number of signatures can be reviewed in State administrative and judicial proceedings questioning the signatures.

**D.**

There remain two further arguments made by Judge Logan's dissent which we should consider.

First, it is said that the Colorado statute's interference with First Amendment rights is minimal since the Constitution does not require states to provide their citizens with an initiative procedure. We disagree. It is true that the United States Constitution does not confer the right to use the initiative procedure. *See Kelly v. Macon-Bibb County Board of Elections*, 608 F.Supp. 1036, 1038–39 & n. 1 (M.D.Ga. 1985); *Georges v. Carney*, 546 F.Supp. 469, 476 (N.D.Ill.), *aff'd*, 691 F.2d 297 (7th Cir. 1982). *But cf. Diaz v. Board of County Commissioners*, 502 F.Supp. 190, 193 (S.D. Fla.1980) (initiative procedure is one means of preserving citizens' "unquestioned right to petition their governments for redress of what they believe are grievances").[14]

---

649 P.2d 303 (Colo.1982); *Billings v. Buchanan*, 192 Colo. 32, 555 P.2d 176, 176–79 (1976); *Case v. Morrison*, 118 Colo. 517, 197 P.2d 621, 621–24 (1948); *Haraway v. Armstrong*, 95 Colo. 398, 36 P.2d 456, 457–58 (1934); *Miller v. Armstrong*, 84 Colo. 416, 270 P. 877, 878–79 (1928).

**14.** We note that in Colorado the right to the initiative is not a matter of legislative grace but a right reserved by the people in the State constitution. Colo. Const. art. II, §§ 1, 2 & art. V,

§ 1; *In re Proposed Initiative Concerning Drinking Age in Colorado*, 691 P.2d 1127, 1130 (Colo. 1984); *Urevich v. Woodard*, 667 P.2d 760, 762 (Colo.1983). The Colorado courts have treated the initiative as "a fundamental right at the very core of our republican form of government," and "viewed with the closest scrutiny any governmental action that has the effect of curtailing its exercise." *McKee v. City of Louisville*, 200 Colo. 525, 616 P.2d 969, 972 (1980).

Nonetheless, we do not think that Colorado's constitutional choice to reserve the initiative for the people leaves the State free to condition its use by impermissible restraints on First Amendment activity. As one court explained: "[A]lthough the right to place a question on the ballot is not fundamental in Illinois, the legislature has seen fit to confer such right. Once Illinois decided to extend this forum, it became obligated to do so in a manner consistent with the Constitution." *Georges v. Carney*, 546 F.Supp. at 476–77. The dissent's argument fails as has the discredited rationale for rejecting Government employees' constitutional claims on the notion that there is no "constitutional right to government employment." *Slochower v. Board of Higher Education*, 350 U.S. 551, 555, 76 S.Ct. 637, 639, 100 L.Ed. 692 (1956); *see also Barsky v. Board of Regents*, 347 U.S. 442, 473, 74 S.Ct. 650, 666, 98 L.Ed. 829 (1954) (Douglas, J., dissenting) ("the question here is not what government must give, but rather what it may not take away").

In the same vein Judge Logan's dissent relies on the reasoning in *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico*, —— U.S. ——, ——, 106 S.Ct. 2968, 2979, 92 L.Ed.2d 266 (1986), that "the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling ..." Hence the argument is made that the power to withhold the initiative process entirely includes the power to impose the restriction on its exercise in Colorado. The references to greater and lesser powers to restrict activities "deemed harmful" and "the stimulation of demand" for them, *id.* at ——, 106 S.Ct. at 2979, are not logically applicable here. The valid question raised by such reliance on *Posadas* is whether the power to ban casino gambling entirely would include the power to ban public discussion of legislative proposals regarding the legalization and advertising of casino gambling. We are convinced that the answer to that question must be in the negative.

The proposition that activities "deemed harmful" by a state can sometimes be reg-

ulated to minimize their harmful effects without violating the First Amendment does not save the restrictive Colorado statute in question here. *See, e.g., Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (upholding local zoning ordinances prohibiting adult theatres from being located within 1,000 feet of each other); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (upholding regulation of billboards containing commercial messages but declaring unconstitutional regulations as they related to non commercial speech). Such regulations are a far cry from restrictions on public discussion of legislative proposals concerning state regulatory policy.

In addition, *Posadas* is inapplicable to the present case for a more fundamental reason—the speech restricted in *Posadas* was merely "commercial speech which does 'no more than propose a commercial transaction....'" *Posadas,* —— U.S. at ——, 106 S.Ct. at 2976 (quoting *Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976)). The Supreme Court has "consistently distinguished between the constitutional protection allowed commercial as opposed to noncommercial speech." *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 504–05, 101 S.Ct. 2882, 2891, 69 L.Ed.2d 800 (1981). "The Constitution 'accords less protection to commercial speech than to other constitutionally safeguarded forms of expression.'" *Posadas,* —— U.S. at ——, 106 S.Ct. at 2981 (Brennan, J., dissenting) (quoting *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 64–65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983)). *Accord Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980). Here, by contrast, the speech at issue is "at the core of our electoral process and of the First Amendment freedoms," *Buckley,* 424 U.S. at 39, 96 S.Ct. at 644 (quoting *Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968)—an area

of public policy where protection of robust discussion is at its zenith.

Second, Judge Logan argues in dissent that the "speech by proxy" doctrine makes strict scrutiny inappropriate in this case. The opinion of the district judge likewise reasoned that the contributor was paying someone else to speak and thus the contributor's speech was not restricted. 741 F.2d at 1212. We note that the Court in *Buckley* did say that "[w]hile contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." 424 U.S. at 21, 96 S.Ct. at 636. Four members of the Court later extended this principle in upholding a $5000 limit on the amount an unincorporated association could contribute to a multicandidate political committee. *California Medical Association v. Federal Election Commission,* 453 U.S. 182, 196–97, 101 S.Ct. 2712, 2721–22, 69 L.Ed.2d 567 (1981) (plurality). However, the Court later refused to apply the "speech by proxy" concept in *Federal Election Commission v. National Conservative Political Action Committee,* 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). There the Court held that a $1000 limitation on campaign expenditures by independent political committees was in violation of the First Amendment. *Id.* at 497–98, 105 S.Ct. at 1469–70. The Court gave forceful reasons for its refusal to use the "speech by proxy" analysis:

> Unlike *California Medical Assn.,* the present case involves limitations on expenditures by PACs, not on the contributions they receive; and in any event these contributions are predominantly small and thus do not raise the same concerns as the sizeable contributions involved in *California Medical Assn.*

> Another reason the "proxy speech" approach is not useful in this case is that the contributors obviously like the message they are hearing from these organizations and want to add their voices to that message; otherwise they would not part with their money. To say that their collective action in pooling their re-

sources to amplify their voices is not entitled to full First Amendment protection would subordinate the voices of those of modest means as opposed to those sufficiently wealthy to be able to buy expensive media ads with their own resources.

*Id.* at 495, 105 S.Ct. at 1468.

We think that *Federal Election Commission* compels a similar refusal to use the "speech by proxy" analysis here. It is the plaintiffs' expenditures, not contributions to them, which are limited. These expenditures advance the plaintiffs' own political expression for the ballot measure, a right of communication given constitutional protection. As the Court said in *Citizens Against Rent Control:* "Contributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression." 454 U.S. at 298, 102 S.Ct. at 297.

Thus the reasoning of the dissent, which seeks to escape the strict scrutiny test for First Amendment restrictions, does not withstand analysis and that test must be followed as in *Bellotti* and *Citizens Against Rent Control.* And for reasons stated earlier, the Colorado restriction on First Amendment rights does not withstand strict scrutiny.

## IV

We are further persuaded by the analysis of other courts which have generally struck down similar restrictions on the payment of petition circulators as violative of the First and Fourteenth Amendments.

It is true that in *State v. Conifer Enterprises, Inc.,* 82 Wash.2d 94, 508 P.2d 149 (1973), the Washington Supreme Court held that a Washington statute prohibiting payment of petition circulators did not violate the First Amendment. However, that decision preceded *Buckley* and was based on the Washington Court's finding that while the solicitation of signatures on an initiative petition is political expression protected by the First Amendment, there is no necessary relationship between the pay-

ment of circulators and the exercise of that right. *Id.* 508 P.2d at 153. *Buckley* rejected this theory, stating that

> [a] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

424 U.S. at 19, 96 S.Ct. at 634 (footnote omitted).

In *Libertarian Party of Oregon v. Paulus*, Civ. No. 82–521FR, slip op; (D.Ore. Sept. 3, 1982), the federal district court relied primarily on *Buckley* in striking down, on First Amendment grounds, an Oregon statute prohibiting payment to petition circulators. The court held that the statute restricted political speech because obtaining signatures on a nominating petition required the circulator to explain the candidate's views on political issues.

In *Hardie v. Fong Eu*, 18 Cal.3d 371, 134 Cal.Rptr. 201, 556 P.2d 301 (1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 360 (1977), the California Supreme Court similarly held that a statute limiting the amount that could be spent on the circulation of petitions was unconstitutional. The court relied on *Buckley* and particularly its recognition that virtually every means of political communication in modern society requires or involves the expenditure of money. *Id.* 556 P.2d at 303.

More recently, the federal district court for the District of Maryland invalidated a state statute like that of Colorado. *Ficker v. Montgomery County Board of Elections*, 670 F.Supp. 618 (D.Md.1985). The court concluded that the statute restricts the discussion of ballot issues and the size of the audience that can be reached. *Id.* at 620. The court held that this restriction on political expression could not be justified.

The federal district court for the District of Columbia also invalidated a statute prohibiting payment to circulators of initiative petitions, reasoning that the restriction on First Amendment interests was not justified by the legislative findings or record evidence. *D.C. Committee on Legalized Gambling v. Rauh*, No. 79–3296, slip op. at 2 (D.D.C. Dec. 21, 1979).

Thus persuasive precedents since *Buckley* reject the efforts to restrict First Amendment rights by means like those employed by the Colorado statute.

### V

In sum, we conclude that Colo.Rev.Stat. § 1–40–110 unconstitutionally imposes a direct and substantial restriction on plaintiffs' right to political speech, employing unnecessarily broad prohibitions. In the area of free expression "[p]recision of regulation must be the touchstone...." *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). We hold that the ban on payment of petition circulators in the Colorado statute violates the First and Fourteenth Amendments. Accordingly the judgment is reversed and the case is remanded to the district court for entry of an appropriate declaratory judgment.

BARRETT, Circuit Judge, dissenting:

I respectfully dissent for the reasons set forth in the district court's memorandum and this court's *per curiam* opinion (Holloway, Circuit Judge, dissenting) entitled *Grant v. Meyer*, 741 F.2d 1210 (10th Cir. 1984).

I do not view the Colorado statute as a burden on First Amendment rights. Further, I believe that the statute here considered, i.e., Sect. 1–40–110 C.R.S. (1980) which prohibits payment of initiative petition circulators, is fully justified in protecting the integrity of Colorado's initiative process.

LOGAN, Circuit Judge, dissenting:

I agree that this appeal should be considered on the merits. And if I could agree with the implicit assumptions of the majority opinion in its discussion of the merits, I would be persuaded by it. But the majori-

ty treats this as a pure "speech" case, thereby invoking exacting scrutiny as the standard of review. The majority sees no distinction between restricting use of the initiative and limiting expenditures to support or oppose candidates or measures already on the ballot. The majority rejects applicability of the "speech by proxy" standard of review, and it finds Colorado's interest in denying use of paid petition circulators insufficient to uphold the legislation. I disagree with all of these assumptions and findings.

I

First, the statute at issue implicates First Amendment rights but proscribes only conduct. The statute does not prohibit citizens from spending their money in any way to express their views on a public issue on the ballot, including an initiative proposition after it has met the statutory requirements to appear on the ballot. The statute does not prohibit citizens from spending any amount of money or from associating to express their views on any public issue, including one they would like to see on an initiative ballot. Although it does prohibit paying someone for circulating an initiative petition or for signing it, the statute in no other way prohibits anyone from paying others to espouse their views to people whom they hope will sign an initiative petition. For example, it was reported that, in the 1982 Colorado initiative to allow grocery stores to sell wine, "substantial sums [were] spent to organize and advertise a petition drive, while avoiding actual payment to circulators." The Initiative News Report, vol. IV, no. 3, at 2 (Feb. 11, 1983).

The majority treats the obtaining of signatures by paid petition circulators as inseparable from the dissemination of political ideas through such individuals. This is clearly not the case. Under the statute as written, it would be perfectly legal for plaintiff's paid representatives to "approach[ ] a stranger, ask[ ] him if he is a registered voter, and, if the person is willing to listen, advance[ ] arguments why the petition should be placed on the ballot." At 1452–53. They are simply forbidden to take the final step of obtaining the listener's signature. It is thus conduct, not speech, that Colorado seeks to regulate. " '[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' " *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949)).

Only because the majority opinion incorrectly characterizes the statute as directly restricting unalloyed political expression is it able to insist on the standard of strict or exact scrutiny, which the majority concedes is given only to "limitations on core First Amendment rights of political expression." At 1453.[1] The standard for speech intermingled with activity is a more flexible one. "[W]here speech and conduct are joined in a single course of action, the First Amendment values must be balanced against competing societal interests." *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, ——, 106 S.Ct. 2034, 2038, 90 L.Ed.2d 480 (1986).

The First Amendment forbids the government from regulating speech in ways "that favor some viewpoints or ideas at the expense of others." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984). This statute does not violate that precept. It displays no bias against ideas or censorship. In *Members*, the Supreme Court upheld a municipal ordi-

---

1. Whether the Colorado state courts have used strict scrutiny to review governmental actions affecting the initiative, as the majority opinion suggests at 1455 n. 14, is relevant, if correct, only to whether this statute is compatible with the *state* constitution. That question is not before us. Nor is there any question here of constitutional due process or equal protection that would warrant or at least account for the majority's invocation of employee discharge cases. The only question before us is whether this statute is incompatible with First Amendment free speech guarantees of the United States Constitution.

nance that prohibited posting signs on public property against a political candidate's claim it violated his First Amendment rights. There the Court said:

"While the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places, ... a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate.... The Los Angeles ordinance does not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited. To the extent that the posting of signs on public property has advantages over these forms of expression, ... there is no reason to believe that these same advantages cannot be obtained through other means. To the contrary, the findings of the District Court indicate that there are ample alternative modes of communication in Los Angeles. Notwithstanding appellees' general assertions in their brief concerning the utility of political posters, nothing in the findings indicates that the posting of political posters on public property is a uniquely valuable or important mode of communication, or that appellees' ability to communicate effectively is threatened by ever-increasing restrictions on expression."

*Id.* at 812, 104 S.Ct. at 2132 (citations and footnotes omitted). The case at bar fits that analysis.

The state has justified its limitation on paid solicitors by asserting its interest in ensuring that any initiative placed on the ballot has broad popular support.[2] As Justice White noted regarding the role of the initiative in California, it "cannot be separated from its purpose of preventing the dominance of special interests." *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 311, 102 S.Ct. 434, 445, 70 L.Ed.2d 492 (1981) (White, J., dissenting). The state thus has a legitimate interest in using the initiative only as a safety valve against widespread unrest, and thereby ensuring that this alternative to legislative action is used only when it has the earmarks of populist movement.

Colorado has presented empirical data which compared initiatives proposed through workers paid to circulate petitions with those proposed through volunteer solicitors. Initiatives proposed through volunteer petitioners had a much greater chance of adoption. A state exhibit indicated that the voters adopted forty-eight percent of the initiatives circulated by volunteers, whereas they adopted only twenty-four percent of those using paid solicitors. The Initiative News Report, vol. IV, no. 3, at 2 (Feb. 11, 1983). Common sense tells me the same thing: A proposition for which large numbers of volunteers come forward to solicit the necessary signatures is more likely to have widespread popular support, and hence ballot appeal, than a proposition that requires paid workers to obtain the necessary signatures. The majority's recital of what paid solicitors can do to enhance the possibility of a successful drive to put a proposition on the ballot, *see* Op. at 1452–1453, only increases my conviction that if enough money is spent the original "safety valve" purposes of the initiative would be thwarted.

In a recent publication, a former General Counsel of the U.S. House of Representatives Committee on the Judiciary wrote,

"Common Cause says if you hire the right people you can qualify anything for the ballot. In California, there are a dozen initiative-circulating consulting

---

**2.** The state also seeks to support the constitutionality of the legislation by arguing that petition solicitors are in a sense election judges, and unpaid volunteers are somehow more trustworthy and dependable than paid solicitors. I agree with the majority that the argument is wholly unconvincing. Neither the unpaid volunteer nor the paid solicitor is likely to violate a statute that makes it a felony to falsify signatures or otherwise breach the integrity of the petitions. An overzealous volunteer would in fact seem more likely to overstate supporting arguments for the proposition than the paid solicitor, and both are likely to use friendship or other appeals irrelevant to the merits to obtain signatures. Further, those who sign the petitions do not represent that they will vote for the proposition that is the subject of the initiative or express any opinion other than their willingness to have the proposition appear on the ballot.

firms—the 'initiative industry'—that are now branching out into other states. What was originally, [sic] designed to be a volunteer or citizens' effort, which grew out of a progressive era in the West, has become a slick and professional industry."

Parker, *Washington Focus*, Trial, Aug. 1987 at 17.

The state has ample justification, in my view, for any minor encroachment on First Amendment rights that might be involved in this state enactment. *Cf. Hall v. Simcox*, 766 F.2d 1171, 1177 (7th Cir.) (state can limit access to ballot in order to fulfill its electoral purpose), *cert. denied*, 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 459 (1985).

## II

There is another flaw in the majority's analysis. The federal Constitution provides no individual citizen with the right to the initiative—the right to commence a procedure through which a proposed constitutional or other change in the law can be placed upon a state or federal ballot. *See Georges v. Carney*, 691 F.2d 297, 300 (7th Cir.1982); L. Tribe, *American Constitutional Law* § 13–17 (1978). The initiative is a state-created procedure, which originated in the populist movement as a device to permit more direct citizen input. Less than half of the states provide, by constitution or statute, for this type of direct democracy.

Thus Colorado would not violate the federal Constitution if it prohibited the initiative entirely. It could deny its citizens any method, other than action through their elected representatives, to amend the state constitution or to adopt new laws. Because the state need not allow the initiative at all, surely it can place reasonable restrictions on its use. For example, it could require, instead of a total of signatures equal to five percent of those who last voted for secretary of state, a total equal to twenty-five percent, fifty percent, or even one hundred percent of such voters. The state need only act uniformly toward all who would use the process it allowed. *Cf. Gordon v. Lance*, 403 U.S. 1, 91 S.Ct.

1889, 29 L.Ed.2d 273 (1971) (upholding sixty percent vote requirement in referendum on incurring bond indebtedness).

Colorado has legislated in an area reserved to it—the initiative is not among the rights which the federal constitution explicitly protects—and in a manner, as discussed in part I, that only minimally interferes with First Amendment rights. Viewed from this perspective, this case seems analogous to the case recently before the Supreme Court, *Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico*, —— U.S. ——, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986). There the Court upheld the validity of a Puerto Rican statute that restricted advertising aimed at residents while permitting advertising aimed at nonresidents. The Court acknowledged that it was dealing with a First Amendment issue, albeit commercial speech, but based its opinion upholding the restriction on the power of Puerto Rico to prohibit casino gambling altogether. "In our view, the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling, and *Carey [v. Population Services Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977)] and *Bigelow [v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975)] are hence inapposite." —— U.S. at ——, 106 S.Ct. at 2979.

There also the appellant made the related argument, like that made by the majority in the instant case, that having chosen to permit gambling for residents the First Amendment prohibits the legislature from using restrictions that touch on speech to accomplish its goal of controlling access. The Supreme Court answered that argument as follows:

"[I]t is precisely *because* the government could have enacted a wholesale prohibition of the underlying conduct that it is permissible for the government to take the less intrusive step of allowing the conduct, but reducing the demand through restrictions on advertising. It would surely be a Pyrrhic victory for casino owners such as appellant to gain recognition of a First Amendment right

to advertise their casinos to the residents of Puerto Rico, only to thereby force the legislature into banning casino gambling by residents altogether. It would just as surely be a strange constitutional doctrine which would concede to the legislature the authority to totally ban a product or activity, but deny to the legislature the authority to forbid the stimulation of demand for the product or activity through advertising on behalf of those who would profit from such increased demand."

*Id.* (emphasis in original).

I agree with the majority that a state which chooses to create a right may not take it away without providing the procedural due process guarantees of the federal Constitution. But the instant statute does not deny procedural due process. The limitation here is in the definition of the right. Suppose, for example, the statute provided that initiative petitions could not be circulated at all, but must be posted in designated public places where registered voters could come to and sign. I dare say we would not find such a law would violate First Amendment rights. I see no principled difference in the law at issue here.

### III

Even if we focus exclusively on the speech component of the petition circulating activity before us here, that speech is most analogous to the "speech by proxy" achieved through contributions to a political campaign committee. Such speech is not appropriately reviewed under a strict or exacting scrutiny standard. Just as contributors to a campaign committee depend on others to espouse their political views for them, the hirers of petition circulators depend on paid circulators to decide what "pitch" to use to obtain signatures. Justice Marshall stated in *Citizens Against Rent Control*, 454 U.S. at 301, 102 S.Ct. at 440:

"this Court has *always* drawn a distinction between restrictions on contributions, and direct limitations on the amount an individual can expend for his own speech. As we noted last term in *California Medical Assn. v. FEC*, 453 U.S. 182, 196 [101 S.Ct. 2712, 2722, 69 L.Ed.2d 567 (1981)] (MARSHALL, J., joined by BRENNAN, WHITE, and STEVENS, JJ.), the 'speech by proxy' that is achieved through contributions to a political campaign committee 'is not the sort of political advocacy that this Court in *Buckley* found entitled to full First Amendment protection.' "

(Marshall, J., concurring in the judgment).[3]

In a case challenging federal regulation of corporate and labor union solicitation practices on equal protection and First Amendment grounds, the District of Columbia Circuit stated:

"While heightened scrutiny often attends a legislative classification alleged to impinge on First Amendment interests, we reject plaintiffs' argument that the most stringent review standard should apply in this case. Decisions in point may lack perfect consistency and crystal clarity, but they do reveal that the nature and quality of the legislative action determine the intensity of judicial review of intertwined equal protection, First Amendment claims.

. . . . .

*Mosley* itself enunciated review standards that were not the most exacting, and *Buckley v. Valeo* drew distinctions bearing on the rigorousness of review based on the character of the several legislative proscriptions the Court scrutinized. . . . We are therefore confident that the matter before us does not call for a review standard more demanding than this elevated, but not strictest, test: the challenged legislative action must bear a substantial relation to an important governmental interest."

*Conservative Political Action Comm.*, 470 U.S. 480, 494–95, 105 S.Ct. 1459, 1467–68, 84 L.Ed.2d 455 (1985).

---

**3.** Although the "speech by proxy" doctrine has never been endorsed explicitly by a majority of the Supreme Court, it continues to receive attention in Court opinions. *See FEC v. National*

*International Association of Machinists and Aerospace Workers v. FEC,* 678 F.2d 1092, 1105–06 (D.C.Cir.) (footnotes and citations omitted), *aff'd mem.,* 459 U.S. 983, 103 S.Ct. 335, 74 L.Ed.2d 379 (1982). Therefore, it is clear that not in all situations do First Amendment concerns require strict scrutiny. If less than strict scrutiny applies to the case before us, we must uphold the constitutional validity of the statute.

But even if we do apply strict or exacting scrutiny, *see Citizens Against Rent Control,* 454 U.S. at 298, 102 S.Ct. at 438, I believe the Colorado statute should be upheld. Despite the undisputed burden that ballot restrictions in candidate cases have had on First Amendment rights, such restrictions frequently withstand strict scrutiny. *See Anderson v. Celebrezze,* 460 U.S. 780, 788 & n. 9, 103 S.Ct. 1564, 1569 & n. 9, 75 L.Ed.2d 547 (1983). Most often courts find that these limited restrictions are necessary to protect the integrity of the electoral process. *Id.* Professor Tribe explains:

> "Whatever its doctrinal roots, there is a principle to be distilled from *American Party* [*v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1964)] and *Storer* [*v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)]: in order to keep ballots manageable and protect the integrity of the electoral process, states may condition access to the ballot upon the demonstration of a 'significant, measurable quantum of community support,' but cannot require so large a demonstration of support that minority parties or independent candidates have no real chance of obtaining ballot positions.... In appraising the collective burden imposed by access requirements, one must place substantial weight on empirical evidence demonstrating how often minority parties and independent candidates have actually been able to satisfy them."

L. Tribe, § 13–20, at 783–84 (footnotes omitted). Just as placing too many candidates on a ballot wastes state resources and confuses voters, so does placing numerous initiatives on a ballot. *See Anderson,* 460 U.S. at 788 n. 9, 103 S.Ct. at

1570 n. 9. In my view, the state has used the least restrictive measure to achieve its justifiable goal of insuring there is widespread popular support for any initiative proposition it allows on the ballot. Therefore, I would affirm the district court's decision.